**Adolfo ALVAREZ**

v.

**Pedro ESPINOZA.**

**No. 04–92–00440–CV.**

Court of Appeals of Texas,
San Antonio.

Nov. 19, 1992.

Rehearing Denied Nov. 19, 1992.

Second Rehearing Denied Dec. 30, 1992.

Adolfo "Al" Alvarez, Law Offices of Adolfo Alvarez, Keith C. Livesay, Barron, Orendain, Malany & Flanagan, McAllen, Ramon Garcia, Law Office of Ramon Garcia, Edinburg, Sharon T. Hanko, Hanko & Triana, Austin, for appellant.

James W. Smith, Jr., Frio County Atty., Pearsall, Roy R. Barrera, Jr., Sharon S. Brown, Nicholas & Barrera, Inc., John E. Clark, Goode, Casseb & Jones, San Antonio, for appellee.

## ON APPELLANT'S MOTION
## FOR REHEARING

PER CURIAM.

Appellant's motion for rehearing is overruled. Our previous opinion of October 2, 1992, is replaced by the following.

Pedro Espinoza defeated Adolfo Alvarez by twenty-three votes in the Democratic primary run-off election for Frio County Commissioners Court, Precinct Three. Alvarez filed an election contest alleging that the election officials improperly allowed unqualified voters to vote, improperly rejected the ballots of qualified voters, and violated election code procedures. The trial court found that ten unqualified voters voted in the election, but that Espinoza still had a thirteen-vote margin and that the ten improper votes did not change the outcome. The court also held that any violations of the election code pertained to directory provisions and not to mandatory ones.

Alvarez's complaints in this court fall into four categories: (1) election officials violated various election code procedures; (2) several ballots submitted early by mail were improperly rejected; (3) nonresidents were allowed to vote; and (4) an election judge solicited votes for Espinoza. We agree that there were procedural violations: six nonresidents were allowed to vote, and three early voters by mail were improperly disqualified. But because Espinoza still has a four-vote margin and the procedural violations did not affect the outcome of the election, we affirm the judgment.

Initially Alvarez contends that the trial court's findings of fact and conclusions of law are "confusing, contradictory, and incomplete," which makes it impossible for him to present his appeal properly. Alvarez specified his complaints concerning each of the findings and conclusions and asked the court to make amended or additional findings. But he did not draft and submit proposed additional findings and conclusions.

After the court files original findings of fact and conclusions of law, any party may file "a request for *specified* additional or amended findings or conclusions." TEX. R.CIV.P. 298 (emphasis added). As the supreme court held long ago, "Rule 298 contemplates that the request for further additional or amended findings ... shall specify the further additional or amended findings that the party making the request desires the trial court to make and file." *Wagner*

*v. Riske,* 142 Tex. 337, 178 S.W.2d 117, 119–20 (1944). A bare request is not sufficient; proposed findings must be submitted. *See Heard v. City of Dallas,* 456 S.W.2d 440, 445 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.).

■ Alvarez also complains that the findings are too general, but we conclude they are specific enough. They resolve the controlling issues and reveal the basis for the court's judgment. *See Gutierrez v. Gutierrez,* 791 S.W.2d 659, 667 (Tex.App.—San Antonio 1990, no writ). We note that Alvarez has been able to identify the factual and legal bases for the trial court's action and attack them in this court.

■ The trial court did not attempt to determine which candidate received any of the illegal ballots that were cast. Instead the court determined whether the number of illegal votes exceeded Espinoza's margin. The election code permits this approach, and neither party complains about it. *See* Tex.Elec.Code Ann. §§ 221.009–221.012 (Vernon 1986); *Green v. Reyes,* 836 S.W.2d 203, 208–11 (Tex.App.—Houston [14th Dist.] 1992, no writ).

## I. PROCEDURAL IRREGULARITIES.

Alvarez first complains that several procedural irregularities permeated the election. The record shows that the officials did indeed fail to follow certain code provisions, and no one defends their failure to do so. But the code provisions at issue here are directory, and their violation does not require a new election.

■ The election code seeks to prevent error, fraud, mistake, and corruption, and to give effect to the will of the voters. It would frustrate these purposes for courts to set aside an election without proof that the violation affected the result. *See Pra-*

*do v. Johnson,* 625 S.W.2d 368, 369–71 (Tex.Civ.App.—San Antonio 1981, writ dism'd); *Little v. Alto Indep. Sch. Dist.,* 513 S.W.2d 886, 891 (Tex.Civ.App.—Tyler 1974, writ dism'd). To overturn an election, the contestant must show that the outcome, as shown by the final canvass, is not the true outcome either because illegal votes were counted, or because an election official prevented eligible voters from voting, failed to count legal votes, or engaged in other fraud or illegal conduct or made a mistake. Tex.Elec.Code Ann. § 221.003 (Vernon 1986).[1] The contestant has the burden to make this showing by clear and convincing evidence. *Reyes v. City of Laredo,* 794 S.W.2d 846, 848 (Tex.App.—San Antonio 1990, no writ); *Jordan v. Westbrook,* 443 S.W.2d 616, 618 (Tex.Civ.App.—San Antonio 1969, no writ). With these principles in mind, we consider the effect of the officials' failure to strictly follow certain procedures.

### A. *Appointment and Qualifications of Election Officials.*

■ Charles Winfield was appointed presiding judge of both the Early Voting Ballot Board and the Signature Verification Committee by the election clerk rather than the Democratic Party county chairman, as the code requires. *See* Tex.Elec.Code Ann. § 32.006 (Vernon 1986) & § 87.002 (Vernon Supp.1992). In addition, Winfield's appointment to the Signature Verification Committee was not made in writing, nor was it posted for the required ten days. *See id.* § 87.027(a), (g). Alvarez complains that as a result of these violations he was unable to object to the appointment of Winfield, who he says was biased, and that public confidence in the election process was undermined.

---

1. Section 221.003 provides:
   (a) The tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because:
   (1) illegal votes were counted; or
   (2) an election officer or other person officially involved in the administration of the election:

    (A) prevented eligible voters from voting;
    (B) failed to count legal votes; or
    (C) engaged in other fraud or illegal conduct or made a mistake.
  (b) In this title, "illegal vote" means a vote that is not legally countable.
  (c) This section does not limit a provision of this code or another statute expanding the scope of inquiry in an election contest.

Espinoza does not defend these election code violations, and we can discern no excuse for them. Nevertheless, the provisions that were violated are directory in the sense that their violation does not justify an order setting aside the election. *See Prado v. Johnson*, 625 S.W.2d 368, 369–70 (Tex.App.—San Antonio 1981, writ dism'd); *Little v. Alto Indep. Sch. Dist.*, 513 S.W.2d 886, 889 (Tex.Civ.App.—Tyler 1974, writ dism'd); *Gayle v. Alexander*, 75 S.W.2d 706, 708 (Tex.Civ.App.—Waco 1934, no writ). Alvarez has not shown that the violations affected the outcome of the election.

We hold that these procedural irregularities are not grounds for setting aside the election results.

■ We also reject the argument that the Signature Verification Committee was unqualified because none of the members had any handwriting training. The only eligibility requirement is that the committee member be a qualified voter of the area covered by the election. TEX.ELEC.CODE ANN. § 87.027(e) (Vernon Supp.1992).

### B. *Deputy Registrar's Registration of Voters.*

■ Alvarez also challenges a voluntary deputy registrar's failure to receive registration applications *in person* and to review them for completeness *in the applicants' presence*, as the law requires. *See* TEX.ELEC.CODE ANN. §§ 13.038, 13.039 (Vernon 1986). Alvarez argues that the registrar's conduct created a significant possibility of fraud. The registrar registered some 106 voters; sixty-eight of these actually voted.

The sixty-eight voters filled out voter registration forms and submitted them to the proper authorities in good faith, assuming that they would thereby be properly registered to vote. The authorities accepted the forms and included the sixty-eight in the lists of registered voters. While we do not condone the registrar's apparent failure to review the applications for completeness in the voters' presence, there is no suggestion that any of the applications were in fact incomplete. The courts should not disfranchise the sixty-eight voters because an official failed to follow the strict letter of the code. We consider this an instance in which a sanction for the sins of the registration official should not visited upon the voter.

### II. EARLY VOTING.

Alvarez maintains that the board did not follow the election code in challenging the eligibility of three voters who mailed in early ballots, and that it erroneously rejected six mailed-in ballots whose signatures did not match the applications.

### A. *Procedure for Challenging Eligibility of Early Voters by Mail.*

Under the election code, any qualified voter may vote early *in person*, but only certain persons (for example, the disabled, the elderly, those who will be absent from the county) may vote early *by mail*. *See* TEX.ELEC.CODE ANN. §§ 82.001–.006 (Vernon Supp.1992). The board rejected three ballots based upon information that the reasons given for voting absentee by mail were incorrect: challengers or board members had personal knowledge that statements of age and disability, which were the reasons for voting early by mail, were untrue.

■ The code mandates a procedure for challenging a voter's eligibility to vote early by mail. *Id.* §§ 88.001–.004. When the person challenging the ballot is not a member of the board, the challenge must be in writing. *Id.* § 88.002. A challenge to an early mail-in ballot "shall be determined only on the basis of information in governmental records unless the voter appears in person to respond to the challenge." *Id.* § 88.003(c). The code defines "governmental record" as a document "filed, prepared, or preserved under this code" or "belonging to, received by, or kept by the state, a political subdivision, or any branch or agency of the state or a political subdivision, for information." *Id.* § 88.003(e).

While the board was entitled to decide the three challenges on the basis of the information before it, the code required the

board to notify the challenged voters in writing within three days and give them a chance to respond. *Id.* § 88.004. The board did not notify the three voters that it had rejected their ballots. The voters were therefore unable to appear and counter the information on which the board rested its decision to reject their votes. If the voters had been notified, they might have been able to reverse the decision or make other arrangements to vote. The ballots were improperly rejected.

█ Espinoza argues that when a ballot has been improperly rejected, the contestant must still show that the rejected ballots were cast by legally qualified voters.[2] Ordinarily that is true. *See Grizzaffi v. Lee,* 517 S.W.2d 885, 892–93 (Tex.Civ. App.—Fort Worth 1974, writ dism'd); *Garza v. Salinas,* 434 S.W.2d 153, 154 (Tex.Civ.App.—San Antonio 1968, no writ); *Brandon v. Quisenberry,* 361 S.W.2d 616, 618 (Tex.Civ.App.—Amarillo 1962, no writ). But when votes were rejected for a reason having nothing to do with the voters' qualifications, the contestant need not show the qualifications of the rejected voters at the election contest trial. *Guerra v. Ramirez,* 364 S.W.2d 720, 725 (Tex.Civ.App.—San Antonio 1963, writ dism'd) (mutilated ballot). Here the board rejected the three votes because its members thought the voters did not qualify to vote early by mail, not because the voters were unqualified. We hold that the three votes should not have been rejected.

### B. *Rejection of Mailed Early Ballots.*

Alvarez contends that the board improperly rejected six ballots submitted by mail. The election code requires creation of an Early Voting Ballot Board and empowers it to screen early voting ballots. *See* Tex. Elec.Code Ann. §§ 87.001–.003, 87.041

(Vernon Supp.1992). To vote early by mail, a voter must first apply in writing for a ballot; then he must mail it to the election clerk in an official carrier envelope bearing his signature. Section 87.041 charges the board to decide whether to accept mailed absentee ballots on the basis of several criteria:

(a) The early voting ballot board shall open each jacket envelope for an early voting ballot voted by mail and determine whether to accept the voter's ballot.

(b) A ballot may be accepted only if:

(1) the carrier envelope certificate is properly executed;

(2) neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness;

(3) the voter's ballot application states a legal ground for early voting by mail;

(4) the voter is registered to vote, if registration is required by law; and

(5) the address to which the ballot was mailed to the voter, as indicated by his application, was outside the voter's county of residence, if the ground for early voting is absence from the county of residence.

Tex.Elec.Code Ann. § 87.041 (Vernon Supp. 1992). The board rejected thirty-five mailed absentee ballots because the signatures on the ballot applications did not match those on the carrier envelopes. Alvarez challenges six of those rejections.

█ The law presumes that the board acted properly in rejecting and accepting ballots; to overcome this presumption, a challenger must show by clear and satisfactory evidence that the board erred. *See*

---

2. In this code, "qualified voter" means a person who:

(1) is 18 years of age or older;

(2) is a United States citizen;

(3) has not been determined mentally incompetent by a final judgment of a court;

(4) has not been finally convicted of a felony or, if so convicted, has:

(A) received a certificate of discharge by the pardons and paroles division of the Texas

Department of Criminal Justice or completed a period of probation ordered by a court and at least two years have elapsed from the date of the receipt or completion; or

(B) been pardoned or otherwise released from the resulting disability to vote;

(5) is a resident of this state; and

(6) is a registered voter.

Tex.Elec.Code Ann. § 11.002 (Vernon Supp.1992).

*Chumney v. Craig,* 805 S.W.2d 864, 865 (Tex.App.—Waco 1991, writ denied); *Reyes v. City of Laredo,* 794 S.W.2d at 848; *Garza v. Salinas,* 434 S.W.2d at 154.

Alvarez seeks to overcome this presumption in two ways. He first argues that a mailed absentee ballot is sufficient if the voter *or someone on the voter's behalf* signed the application and carrier envelope. It is true that in some circumstances the code authorizes an agent to sign for the voter, but the six voters at issue did not use this procedure. The statute says that the board may accept mailed absentee ballots only if the voter personally signed both the application and the envelope, "unless signed by a witness." Alvarez apparently contends that the provision for signing by a witness permits an agent for the voter to sign the voter's name *in the signature space reserved for the voter.*

The code does not authorize such a practice. The code requires the carrier envelope to have a signature space for the *voter* and a separate signature space for *witnesses who sign for voters* who cannot sign for themselves. TEX.ELEC.CODE ANN. § 86.013 (Vernon Supp.1992). A witness acting for a voter must sign his own name and also must print his name and address. The witness may not simply sign the voter's name. If the law were otherwise, there would be great opportunity for fraud.

There is no showing in this record that anyone signed *as witnesses* on the six ballots. Even if an individual had signed a voter's name with the voter's knowledge and consent, the board had to reject the ballot when the signatures did not match.[3]

The law places the burden on those who vote early by mail to sign both the application and the envelope with signatures that match. The Early Voting Ballot Board must act on the basis of the signatures before it. The board is not expected to contact voters whose signatures do not match, and the code does not require it to do so. *See id.* § 87.041. The board must simply preserve rejected ballots and notify the voters within ten days after the election. *See id.* §§ 87.043, 87.0431. There are different procedures when a voter's *eligibility* to vote early by mail is challenged. *See id.* §§ 88.001–.004. If an agent signs either the application or the envelope for a voter, he must use the available signature blank for witnesses and disclose that he signs for the voter in that capacity. Here no one signed as agent for a voter, and the board therefore correctly rejected ballots whose signatures did not match.

Alvarez's second argument is that if proof at the election-contest trial shows that the voter did indeed sign the application and the envelope, the votes must be counted. We agree that in the proper circumstances oral testimony and comparison of signatures might refute the Early Voting Ballot Board's decision. But it does not follow that when the signatures clearly appear to be different, a court must accept the testimony of the voter or other witnesses that the voter made both signatures. The trier of fact may compare signatures and decide their validity without the aid of expert testimony. *See Nass v. Nass,* 149 Tex. 41, 228 S.W.2d 130, 132–33 (1950); *Kennedy v. Upshaw,* 64 Tex. 411, 420 (1885); *Dickerson v. Mack Fin. Corp.,* 452 S.W.2d 552, 557 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.); *Commercial Standard Ins. Co. v. McGee,* 40 S.W.2d 1105, 1106–07 (Tex.Civ.App.—Dallas 1931, no writ); 32 C.J.S. *Evidence* §§ 611–13 (1964).[4] The trial court was not required to believe the testimony about the

---

**3.** For example, there is evidence that the wife of one voter signed his application for a ballot. But the application forms in the record had spaces for the wife to sign, which required her to sign and print her name and address together with a statement of her relationship to the applicant. There is no suggestion that the application was obtained in this way, and therefore the board acted properly in rejecting the ballot when the signatures did not match.

**4.** This rule is modified somewhat in criminal cases. "It is competent to give evidence of handwriting by comparison, made by experts or by the jury. Proof by comparison only shall not be sufficient to establish the handwriting of a witness who denies his signature under oath." TEX.CODE CRIM.PRO.ANN. art. 38.27 (Vernon 1979).

signatures. *See Collora v. Navarro*, 574 S.W.2d 65, 69 (Tex.1978); *Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 467 (Tex.1969); *Medrano v. Gleinser*, 769 S.W.2d 687, 689–90 (Tex.App.—Corpus Christi 1989, no writ).

■ Alvarez argues that the court and the Signature Verification Committee believed that signatures must be identical. Our review of the record shows that none of the challenged sets of signatures are similar enough to compel the conclusion that the same person signed both the application and the envelope, or to override the court's finding that different persons signed them.

The record does not establish that the board erred in rejecting the six ballots submitted with different signatures on the applications and the carrier envelopes.

### III.  VOTING BY NONRESIDENTS.

Alvarez next argues that three categories of nonresidents voted unlawfully: twenty-four voters who had moved, and whose renewal certificates had been returned, did not sign affidavits of residence; thirteen voters were not residents; and six voters had moved from precinct three within ninety days of the election and stayed within the county.

### A.  *Voters Whose Renewal Certificates Were Returned.*

■ Alvarez alleges that the election officials improperly permitted twenty-four voters to vote in violation of § 14.052, which deals with voters whose renewal certificates were returned. The code mandates that every two years the registrar must mail renewal certificates to voters. When the addressee has moved, the post office is told not to forward but to return the renewal certificates. Returned certificates are to be marked with an "R" or a similar notation and noted on a list. *See* TEX.ELEC.CODE ANN. §§ 14.001–.002, 14.051–.052 (Vernon 1986 & Supp.1992). Voters on the "R" list may vote only if they sign an affidavit complying with § 14.052 concerning their residence. *Id.* § 14.052 (Vernon 1986 & Supp.1992).

Thirty-one "R" voters were permitted to vote, but the record contains only seven affidavits of residence. Alvarez contends that the election officials and the trial court violated § 14.052 by allowing the twenty-four votes for which there are no affidavits. But there was evidence that all thirty-one voters had signed affidavits. Three witnesses (the county clerk and the election judge of each of the two voting precincts within commissioners' precinct three) testified that the thirty-one voters signed affidavits, which were turned in to the voter registrar's office. These records were not sealed but were accessible to the public. There was no evidence that any of the twenty-four voters did *not* sign affidavits.

In this nonjury trial, the trial judge was the sole judge of the credibility of witnesses, and he had the discretion to resolve conflicts in the evidence. *Ray v. Farmers' State Bank*, 576 S.W.2d 607, 609–10 (Tex. 1979). In view of the court's implied finding that the twenty-four challenged voters signed proper affidavits, even though the affidavits were not produced at trial, we reject Alvarez's contentions based on § 14.-052.

### B.  *Voting by Nonresidents.*

■ In this court Alvarez identifies thirteen voters whom he alleges to be nonresidents. We may not consider his challenge to four of them because he did not include them on his list of alleged nonresidents in the trial court. *See* TEX.R.CIV.P. 301 (judgment shall conform to pleadings); TEX.R.APP.P. 52(a). Alvarez argues that the residency of the four voters was tried by consent. Ordinarily trial by consent occurs when evidence relevant to the unpleaded issue is admitted and the issue is submitted to the trier of fact without a no-pleading objection on either occasion. *See Harkey v. Texas Employers' Ins. Ass'n*, 146 Tex. 504, 208 S.W.2d 919, 922–23 (1948); *Wendell v. Central Power & Light Co.*, 677 S.W.2d 610, 617–18 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). It must appear that the issue, though unpleaded, was actually tried. Here it is clear from the findings of fact that the

court considered residency challenges to only the listed voters; it sustained challenges to several of them, and expressly rejected the challenge to the others. Thus, although evidence about the four unlisted voters was admitted without objection, their residency was not submitted to the trier of fact, without objection or otherwise. Their residency was not tried by consent.

■ Of the nine other voters challenged in this court, we agree that Alvarez proved that six were nonresidents and should not have voted, but the other three were properly allowed to vote. The Election Code provides the following principles for determining a voter's residence:

(a) In this code, "residence" means domicile, that is, one's *home and fixed place of habitation to which he intends to return after any temporary absence.*
(b) Residence shall be determined in accordance with the *common law rules,* as enunciated by the courts of this state, except as otherwise provided by this code.
(c) A person *does not lose* his residence by leaving his home to go to another place for *temporary* purposes only.
(d) A person *does not acquire* a residence in a place to which he has come for *temporary* purposes only and without the intention of making that place his home.

TEX.ELEC.CODE ANN. § 1.015 (Vernon 1986) (emphasis added). The supreme court has stated that "volition, intention and action" are "equally pertinent" elements to consider. "Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined." *Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex.1964). Thus, under the statute the election officials are to focus on the voter's "home and fixed place of habitation." Intention and presence are important evidentiary factors, and a temporary move from one place to another will neither create a new residence nor lose an old one. In assessing presence, the cases have considered such conduct as where the voter

sleeps and keeps clothes and furniture, and the length of time spent in the alleged residence. *See, e.g., Guerra v. Pena,* 406 S.W.2d 769, 776–77 (Tex.Civ.App.—San Antonio 1966, no writ).

■ The trial court correctly rejected Alvarez's challenge to three of the nine challenged voters. Robert Torres is a full-time college student whose mother (Espinoza's niece) still lives in the district. He comes home for summer and spring break. Alvarez points to evidence that Torres and his girl friend (Olga Garza) live together in Austin, where they attend college, but the trial court's finding that he is a resident is within the evidence. By temporarily moving from the district to go to school Torres has not lost his Frio County residence or acquired one in Travis County.

■ For about a year and a half or two years before the election, Ramiro and Veronica Otero had apparently lived part of the time outside precinct three, and part of the time with her mother inside the precinct. They receive some mail at her mother's home within the district, spend a considerable amount of time there, and claim it as their permanent residence. They said they intend to return to the precinct to live when they can find a house there.

We will not disturb the trial court's decision confirming the election officials' conclusion that Robert Torres and the Oteros are residents of precinct three.

■ As a matter of law, the other six voters were nonresidents, who should not have voted in this precinct three election. Olga Garza, Robert Torres' girl friend, grew up elsewhere and has never lived in Frio County, although she has stayed there with Robert on spring and summer breaks. She is a student in Austin with no other ties to the district. She also works and banks in Austin. Her spring and summer visits to Frio County are not enough contact with the district to satisfy the test for residence.

■ It has been several years since Nelda Ann Gandara, her husband, and their three children lived in the district. Until recently, they were registered to vote

in Dilley, which lies outside precinct three; then they reregistered in precinct three for this election. Gandara claimed her permanent address is that of her husband's parents, who are district residents, but she lived there for only a few months several years ago; the alleged permanent address is essentially a place where they can receive mail. On the same facts, the trial court found that her husband Eleazar is not a resident. The court's conclusions of law list her as a nonresident, though the judgment and findings of fact do not.

▉ Rolando Segovia and Monica Mendez last lived in the district in 1989. One month *after* the election, they moved into the district. Both claim that the home of Rolando's mother inside the district was their residence.

Robert Nieto has lived and worked in San Marcos for three years. He and his wife, who works and goes to college there, will make more definite plans when she graduates. Their children go to school in San Marcos. Both claim Frio County to be their permanent home.

Mary Lou Garza has lived in San Antonio for three years. She and her husband have jobs there which they consider permanent. Though they have not lived in Frio County for three years and have no home there, they intend to return.

These six voters should not have been permitted to vote in the precinct three election. It cannot be seriously argued that precinct three is their "home or fixed place of habitation" under § 1.015. Although they may satisfy the intent element of the test for residence, their presence in the district is, as a matter of law, too attenuated.

### C. *Voters Who Had Recently Moved Within the County.*

▉ The election code deals specifically with voters who change residences within the same county shortly before an election. Under certain circumstances such a voter may vote in his old precinct. Section 11.004 provides:

A registered voter who changes residence to another election precinct in the same county, if otherwise eligible, may vote a *full ballot* in the election precinct of former residence through the 90th day after the date of the change of residence or until the voter's registration becomes effective in the new precinct, whichever is earlier, in an election in which the ballot contains *an* office or proposition stating a measure on which the qualified voters of both the former and new precincts are eligible to vote.

TEX.ELEC.CODE ANN. § 11.004 (Vernon 1986) (emphasis added). Alvarez argues that six voters who had moved from commissioner precinct three to other precincts were unlawfully allowed to vote in their old precinct in violation of § 11.004. Alvarez maintains that such voters may vote only for offices that appear on the ballot in both the old and the new precincts. We disagree with this interpretation.

Section 11.004 means that a voter who changes residence to another precinct in the same county may vote the full ballot in the old precinct if the ballot in the old precinct contains an office or proposition that is also on the ballot in the new precinct. The wording of the statute compels this interpretation; the statute permits the voter to vote "a *full* ballot" in the former precinct during the ninety-day period, provided the ballot "contains *an* office or proposition" on which voters in both precincts may vote. And the interpretation urged by Alvarez would be unworkable; we do not understand how the election judges in the old precinct could ensure that the voter voted only in races common to the old and the new precincts without violating the ballot secrecy to which the voter is entitled. In most circumstances § 11.004 gives those who have recently moved within the county and have not registered in their new precinct the right to vote in the old precinct.

The six voters were correctly allowed to vote in their old precinct even though they had moved elsewhere in the county within the last ninety days.

### IV. SOLICITATION BY ELECTION OFFICIALS.

▉ Alvarez contends that Winfield violated his oath of office by soliciting votes

while in his official capacity as an election judge. TEX.ELEC.CODE ANN. § 62.003 (Vernon 1986).[5] He argues that Winfield's duty not to politick began in the primary election and continued through the runoff election because the runoff election was merely a continuation of the primary election. This solicitation, he says, improperly tainted the entire election process.

Winfield served as election judge during the early balloting for both the primary and runoff elections. His duties were to count votes on each election day; he performed no election duties during the early voting period for the runoff election. Winfield testified that he understood the oath to apply only on election day while he was working in his official capacity as an election judge. He admits soliciting votes for Espinoza, but said he did not do this while serving as election judge.

We cannot agree that Winfield was muzzled twenty-four hours a day from the time he first took the oath on March 10, the day of the primary election, through April 14, the day of the primary runoff election. Section 62.003 requires the oath to be taken at the polling place before the polls open; clerks who arrive after the oath is taken must take the oath before performing duties as an election officer.

For these reasons we conclude that the oath governs the conduct of election officials from the time it is taken on election day until completion of that day's official duties by surrendering election materials to the proper authorities. While a primary runoff election is in some sense a continuation of the primary election, they are two separate elections and the oath must be taken on each election day. Winfield was not forbidden to politick between the general primary election and the runoff.

\* \* \* \* \* \*

We express our concern about the election code violations shown in this record. We recognize that elections are seldom perfect, and that courts do not order new elections because of errors that did not affect the outcome.

But perceptions of fairness are also important. The public must have confidence that the election process is fair for all candidates. It is therefore imperative that election officials comply with code procedures. Those who have studied history and have observed the fragility of democratic institutions in our own time realize that one of our country's most precious possessions is the commitment of our public officials to the rule of law—fair and evenhanded application of rules known in advance—and the widespread acceptance of election results. Repeated abuse of power by election officials can chip away at public respect for our legal institutions and undermine the willingness of losing candidates to accept the results. Cases may arise in which official disregard of the election laws is so pervasive that the courts could not let the election stand, even though the contestant might not be able to prove that the violations caused an incorrect outcome. That point was not reached here.

We note that neither side in this election can claim total purity; each side successfully challenged votes and voters. Because Alvarez lost the election, this appeal has necessarily dealt with his challenges.

The record before us shows that only nine votes were improperly allowed, which leaves Espinoza with a four-vote margin. No other material error is shown. The judgment is therefore affirmed.

**5.** Section 62.003 provides:

(a) The presiding judge and the election clerks present at the polling place before the polls open shall repeat the following oath aloud:

"I swear (or affirm) that I will not in any manner request or seek to persuade or induce any voter to vote for or against any candidate or measure to be voted on, and that I will faithfully perform my duty as an officer of the election and guard the purity of the election."

(b) A clerk who arrives after the oath is made shall repeat the oath aloud before performing any duties as an election officer.