Barbara SLUSHER, Appellant,

v.

Sylvia STREATER, Appellee.

No. 01–94–01058–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 19, 1995.

Rehearing Overruled March 30, 1995.

**240**

William E. King, Kemah, for appellant.

George W. Vie, III, Galveston, for appellee.

Before COHEN, HEDGES and WILSON, JJ.

## OPINION

WILSON, Justice.

■ This is an accelerated appeal in an election contest. Appellant, Barbara Slusher, the defeated candidate in the May 7, 1994 election for Kemah city council, appeals from a judgment declaring that election valid because an insufficient number of illegal votes were cast in the election to affect its outcome. We affirm.

Slusher was a candidate for the office of city council, position five, in Kemah. Streater, the incumbent, won the election by a margin of nine votes according to the final canvass. The total votes cast were 435. Two days after the election, Slusher filed suit contending that certain voters voted illegally because they were not Kemah residents. She requested in her petition an inspection of the ballots under the supervision of the trial court.

The trial court ordered the ballots be delivered to the court for inspection at a pretrial status conference. An inspection and recounting of the ballots showed that Streater won the election by 11 votes, rather than nine votes. The contest was tried to the bench. The trial court found that, of the 18 votes Slusher challenged, eight were illegal,

and 10 were legal. Using the 11 vote margin of victory, the trial court found that the number of illegal votes cast did not equal or exceed the margin of victory. Thus, the number of illegal votes did not affect the election result.

### Election contest

 In an election contest, the contestant has the burden of proving that voting irregularities were present and that they materially affected the elections results. *Guerra v. Garza*, 865 S.W.2d 573, 576 (Tex.App.—Corpus Christi 1993, writ dism'd w.o.j.). The contestant must prove that illegal votes were cast in the election being contested and that a different and correct result would have been reached by not counting the illegal votes. *Green v. Reyes*, 836 S.W.2d 203, 208 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Medrano v. Gleinser*, 769 S.W.2d 687, 688 (Tex.App.—Corpus Christi 1989, no writ). The standard of review in an appeal from a judgment in an election contest is whether from the record it appears that the trial court abused its discretion. *Guerra*, 865 S.W.2d at 576; *Green*, 836 S.W.2d at 208.

The Election Code provides the procedure by which a trial court can ascertain the true outcome of the contested election. Section 221.009 provides that if the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election, the court may declare the election void without attempting to determine how each voter voted. TEX.ELEC.CODE ANN. § 221.009(b) (Vernon 1986). A voter who cast an illegal vote may be compelled to disclose the name of the candidate for whom he or she voted. TEX.ELEC.CODE ANN. § 221.009(a) (Vernon 1986). If the court can ascertain the candidate for which an illegal vote was cast, it must subtract the vote from the official total for the candidate. TEX. ELEC.CODE ANN. § 221.011(a) (Vernon 1986).

After following this procedure, if the court can ascertain the true outcome of the election, the court shall declare the outcome. TEX.ELEC.CODE ANN. § 221.012(a) (Vernon 1986). If not, the court shall declare the election void. TEX.ELEC.CODE ANN. § 221.012(b) (Vernon 1986).

### Validity of judicial recount

 In point of error one, Slusher contends the trial court erred in disregarding the official canvass and basing the difference in the election outcome on an unofficial recount.

The election result as shown by the final canvass showed Streater received 222 votes and Slusher received 213 votes. The final canvass showed that Streater won the election by a margin of nine votes. Slusher's petition requested the trial court inspect the ballots cast in the election. The trial court granted Slusher's request and ordered the ballots be brought to the trial court for an inspection at a status conference. There is no record of the status conference. The trial court's findings of fact and conclusions of law provide that the inspection occurred in open court with the Kemah city secretary present. The city secretary announced that the results of the recount showed Streater received 223 votes and Slusher received 212. Streater's margin of victory was thus 11 votes instead of 9 votes. The findings of fact also provide that neither candidate requested a recount under the Election Code.

At the conclusion of trial, Slusher made the same argument to the trial court as she does here:

> [SLUSHER'S ATTORNEY]: The final canvass, as shown in the testimony in this case, was 222 to 213. A difference of nine votes. The only way that can be different, if there's an official recount and there was no official recount ever called for in this case and, therefore, the difference that we're dealing with is nine votes.
>
> . . . .
>
> [THE COURT]: Excuse me. I thought you were the one who requested the voter recount?
>
> [STREATER'S ATTORNEY]: He did.
>
> [SLUSHER'S ATTORNEY]: *I requested an inspection of the ballots.* If you recall, there were a number of ballots that were marked in various ways, and *we couldn't figure out exactly how the voting clerk had come up with the tallies* or which—

[THE COURT]: My impression was that you wanted a recount of the votes.

[SLUSHER'S ATTORNEY]: But there is a very long procedure in the election code for recounts, and it has to be done by—

[THE COURT]: I just want to clarify that because—

[SLUSHER'S ATTORNEY]: We asked for—

[THE COURT]: *You were the one that motivated all this recounting.*

[SLUSHER'S ATTORNEY]: *Yes.* But anyway, the case law is very clear. This has to be based on the final canvass.

Slusher argues that the Election Code provides specific procedures for recounts; absent these recount procedures, there is no authority for varying the official canvass. *See* TEX.ELEC.CODE ANN. § 212.001 (Vernon Supp.1995). We disagree.

Section 221.003(a) of the Election Code provides that the tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because, among other reasons, illegal votes were counted or an election officer or other person officially involved in the administration of the election made a mistake. TEX.ELEC.CODE ANN. § 221.003(a) (Vernon 1986). Section 221.008 of the Election Code provides in relevant part that "[a] tribunal hearing an election contest may cause secured ballot boxes ... used in the election to be unsecured to determine the correct vote count or any other fact that the tribunal considers pertinent to a fair and just disposition of the contest." TEX.ELEC.CODE ANN. § 221.008 (Vernon 1986).

█ Thus, in an election contest, the trial court is vested with wide discretion in determining all matters necessary or proper to determine the contest's outcome, including whether the ends of justice require the opening of the ballot boxes and a recount of the ballots. *Guerra,* 865 S.W.2d at 578; *Villar-*

*real v. Hedrick,* 579 S.W.2d 41, 45–46 (Tex. Civ.App.—Corpus Christi 1979, writ dism'd); *Little v. Alto Indep. Sch. Dist.,* 513 S.W.2d 886, 892 (Tex.Civ.App.—Tyler 1974, writ dism'd). We will not overturn the trial court's decision to do so unless a clear abuse of discretion on a material issue is shown. *Id.*

There is no record from the status conference. Thus there is nothing in the record showing that Slusher objected to a recount of the ballots during the inspection. There is statutory authority allowing the trial court to open the ballot boxes and recount the votes in an election contest. TEX.ELEC.CODE ANN. § 221.008. That is what occurred here. We find the record does not show the trial court abused his discretion.

Slusher argues that the trial court must use the results of the final canvass to ascertain the true outcome of the election. She relies on cases citing section 221.003 of the Election Code. *Green,* 836 S.W.2d at 208; *Alvarez v. Espinoza,* 844 S.W.2d 238, 242 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.). Section 221.003 provides that the court shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome. Here the trial court did just that. An inspection of the ballots showed that the outcome of the final canvass was not the true outcome because there was a mistake in the counting of the ballots and because some votes were cast illegally. We do not find the authority cited by Slusher prevents the trial court from using the result of a recount in determining the true outcome of the election.[1]

We overrule point of error one.

### Legality of votes

In the next three points of error, Slusher attacks the trial court's findings of fact that 10 voters challenged by Slusher voted legally.

---

1. We note that in *Green,* 22 unopened and uncounted ballots were discovered after the election contest suit had been filed. The ballots were opened under the supervision of the court and were added to the final canvass to determine the true outcome of the election. 836 S.W.2d at 205, 207.

## Standard of review

■ In nonjury cases in which both findings of fact and a statement of facts have been filed, we must review the sufficiency of the evidence under the same standards utilized for jury tried cases. *Green,* 836 S.W.2d 203; *Stern v. Wonzer,* 846 S.W.2d 939, 942 (Tex.App.—Houston [1st Dist.] 1993, no writ). In reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, and disregard all evidence and inferences to the contrary. *Stern,* 846 S.W.2d at 942. If there is any evidence of probative force, we must overrule the point and uphold the finding. *Id.*

■ In reviewing the factual sufficiency of the evidence, we examine all of the evidence, both the evidence that supports the finding and the evidence that controverts the finding. *Stern,* 846 S.W.2d at 942. We will set aside the finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* We note that great deference must be given to the judge's determination of the witnesses' credibility and the weight of their testimony. *Green,* 836 S.W.2d at 212.

## The trial court's findings of fact

The trial court's findings show that, after the ballots were inspected and counted in open court, Streater received 223 votes, and Slusher received 212. Slusher challenged the legality of 18 votes. The trial court found that eight persons voted illegally.[2] Seven of those eight voters stipulated they voted for Streater.[3] Those seven illegal votes were subtracted from the total number of votes received by Streater. Tex.Elec. Code Ann. § 221.011(a). After subtracting the seven illegal votes, Streater received 216 votes. Thus after this initial adjustment, Streater's margin of victory was four votes.

For the election to be void, the number of illegal votes must be equal to or greater than the number of votes necessary to change the

outcome of the election. Tex.Elec.Code Ann. § 221.009(b). In this case, after subtracting the seven illegal votes received by Streater, the number of additional illegal votes necessary to change the outcome of the election and render it void must be equal to or greater than four.

One of the eight votes found to be illegal by the trial court, Elton Porter, Jr.'s vote, was not subtracted from either candidate's total number of votes because the trial court did not determine for which candidate he voted. Thus, Elton Porter's vote is one of the four or more illegal votes needed to affect the outcome of the election. On appeal, Slusher must successfully attack the sufficiency of the evidence supporting the legality of three additional votes the trial court found were legally cast.

## Residency

In point of error two, Slusher contends that the trial court erred in finding the evidence was insufficient to show that eight voters voted legally in that they were residents of Kemah.

Section 1.015 provides that " 'residence' means domicile, that is, one's home and fixed place of habitation to which he intends to return after any temporary absence." Tex. Elec.Code Ann. § 1.015 (Vernon 1986). Residency is determined in accordance with the common law, except as otherwise provided by the Code. Tex.Elec.Code Ann. § 1.015(b) (Vernon 1986). A person does not lose his or her residence by leaving home temporarily. Tex.Elec.Code Ann. § 1.015(c) (Vernon 1986). A person does not acquire a residence in a place to which he or she has come temporarily and without the intention of making that place his or her home. Tex. Elec.Code Ann. § 1.015(d) (Vernon 1986).

■ The term "residence" is an elastic one and is extremely difficult to define. *Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex.1964). The meaning that must be given to it depends on the circumstances surrounding the person involved and largely depends upon

---

2. Anna Hardin, James Hardin, Larry Jessup, Ethel Jessup, Larry Jessup, Jr., Randall Jessup, Thomas Fitzmorris, and Elton Porter, Jr.

3. Anna Hardin, James Hardin, Larry Jessup, Ethel Jessup, Larry Jessup, Jr., Randall Jessup, and Thomas Fitzmorris.

the present intention of the individual. *Id.* Volition, intention, and action are all elements to be considered in determining where a person resides, and such elements are equally pertinent in denoting the permanent residence or domicile. *Id.* "Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined." *Id.* There is no specific length of time for the bodily presence to continue. *Id.*

Thus the focus in determining the residence of a voter is on the voter's home and fixed place of habitation. *Espinoza,* 844 S.W.2d at 247. "Intention and residence are important evidentiary factors, and a temporary move from one place to another will neither create a new residence nor lose an old one." *Id.* In assessing presence, the cases have considered such conduct as where the voter sleeps and keeps clothes and furniture, and the length of time spent in the alleged residence. *Id.*

We will examine the evidence of the residency of the eight voters challenged in this appeal.

### a. Richard Bonner and Kristine Gafas

■ Richard Bonner and Kristine Gafas (also known by her maiden name, Kristine Garbo) did not testify at trial. William Burkhart testified that Bonner and Gafas stated that they lived at 928 FM 518 in Kemah. The residence is near their restaurant, which is located at 930 FM 518, Kemah. Frank Patterson testified that Bonner and Gafas own the What's Cookin restaurant in Kemah on Melba Lane and FM 518.[4] He also testified that they resided in Nassau Bay.

Ms. Gafas' driver's license, issued in 1992, lists her address as 926 FM 518, Kemah, Texas. An application and personal history sheet from the Texas Alcoholic Beverage Commission show Ms. Gafas' address as 1302 Davon, Nassau Bay, Texas. A certified mail return receipt shows that Ms. Gafas signed for mail at 1302 Davon, Nassau Bay, on August 6, 1994, three months after the election. A 1994 telephone directory shows the address for What's Cookin as 930 FM 518. Photographs of the What's Cookin restaurant and of a house at 1302 Davon, Nassau Bay were also admitted into evidence.

There is some probative evidence that Bonner and Gafas resided in Kemah. Therefore, the evidence is legally sufficient to support the trial court's finding that the two voted legally in the election. While contrary evidence was admitted at trial, the record does not show that the judge's findings are so weak as to render the outcome manifestly unjust or clearly wrong. *Green,* 836 S.W.2d at 212. We defer to the trial judge's determination of the witnesses' credibility and the weight of their testimony. *Id.* Thus, the evidence is factually sufficient to support the trial court's finding.

### b. Carl "Mouse" Combs

■ Mr. Combs did not testify at trial. William Burkhart testified that he has known Mr. Combs since Combs was a child. He testified that at the time of trial, Mr. Combs lived in Bacliff; that he had moved the previous week from Kemah, where he had been living on 10th Street in Mark Sequins' house; that he had lived at that Kemah address for about seven or eight months before the election; and while he lived in Kemah, he was with the fire department. This evidence is legally sufficient to show that Mr. Combs was a residence of Kemah at the time of the election and therefore, voted legally.

Other evidence regarding Mr. Combs residency was offered by Slusher. The March 1994 telephone directory shows Mr. Combs address as 3103 George in Kemah. However, records from the Texas Department of Public Safety from 1993 show Mr. Combs address as 3103 George Street in Bayview, Texas. After reviewing the evidence that controverts the finding, we find the evidence is factually sufficient to support the trial court's finding that Mr. Combs voted legally in the election.

### c. Tranette Diehl

■ Ms. Diehl's father testified that she was a full-time student at the University of

---

4. Patterson testified that 926 FM 518 and 930 FM 518 are also addresses for the restaurant.

Houston at the time of the election; her residence and domicile at the time of the election was the family residence, located at 705 Bay Avenue in Kemah; and from January 1994 to July 1994, her parents rented her an apartment in Clear Lake City while she attended school. Other evidence shows that the Ms. Diehl leased an apartment at the Las Palmas Apartments.

A college student's residence is where her home was before becoming a student, unless she has become a bona fide resident of the county in which she is a student. *Mills*, 377 S.W.2d at 637; *Espinoza*, 844 S.W.2d at 247. Here, the evidence was legally and factually sufficient to support the trial court's finding that Ms. Diehl voted legally in the Kemah election.

### d. Eugene Fisher

██ Mr. Fisher testified that his established domicile is 75½ West 5th Street in Kemah; the house at that address is his mother's, and he lives there with her; he bought a house in disrepair about four years ago that is located at 502 Oklahoma in Bacliff, Texas; he has a shop at the Bacliff house where he repairs equipment; he has a room at the Bacliff house; he is gradually remodeling and repairing that house; the Bacliff house is not his residence; he does not spend every day and night at his mother's house; he considers his residence in Kemah; his driver's license shows his address as 75½ West 5th Street; and he shares expenses at his mother's house.

This is probative evidence in support of the trial court's finding that Mr. Fisher is a resident of Kemah and therefore, legally voted; therefore, the evidence is legally sufficient to support the finding. *Stern*, 846 S.W.2d at 942.

Fisher also testified he spends most nights at the Bacliff house. Two other witnesses testified regarding Mr. Fisher's residency. Mr. Fisher's half brother, Bob Garner, testified that Mr. Fisher does not live with his mother. However, Mr. Fisher testified that there is family trouble between Garner and him and his mother. Frank Patterson testified that Mr. Fisher lived at his Bacliff house, which is about one mile from Mr. Patterson's place of business. Patterson testified that he lives two houses down from Mr. Fisher's mother and that Mr. Fisher does not live there.

We note that great deference must be given to the judge's determination of the witnesses' credibility and the weight of their testimony. *Green*, 836 S.W.2d at 212. Here, the trial judge's findings are not so weak as to render the outcome manifestly unjust or clearly wrong. *Id.* We find the evidence is factually sufficient to support the finding that Mr. Fisher legally voted in the election.

### e. Cynthia Williams and Harold Williams

██ Cynthia Williams testified that she and her husband, Harold Williams, got married about one year before the election; her husband is a boat captain; she is the office manager and security for Kemah Warehouse located at 1279 FM 518 East, in League City; her husband is out of town on his boat anywhere from 20 to 30 days a month; her husband's permanent address is at the marina in Kemah; when he is home, the couple stays either on the boat or at her parents' home located at 1009 Delesandri in Kemah;[5] the Delesandri address is where she resided before she was married; in March, she put a bid on a house in Kemah with HUD; the Kemah home was deeded over to Ms. Williams from HUD on May 19, 1994; she also owns a lot on Lewis Drive in Kemah; and the geographic center of her life is in Kemah.

Ms. Williams' driver's license lists her address as 1279 FM 518 East, League City. Ms. Williams has a telephone listing in League City (same address as her driver's license). Answers to interrogatories show that the Williams stated they spent many nights at 555 Bradford, at the marina, which is her husband's permanent address. A 1986 voter's registration application lists Ms. Williams permanent address as the League

---

5. The League City address and the Delesandri address are a couple of streets apart from each other.

City address; however, a 1989 voter's registration application and card lists her address as 1009 Delesandri in Kemah. Mr. Williams driver's license lists his address as 555 Bradford Street in Kemah.

Other witnesses testified as to the Williams' residency. Amy Lynne Sanford, the assistant manager at Lafayette Landing in Kemah, testified that the marina assesses an additional "live aboard fee" for people who reside on their boats in the marina; the fee is assessed if someone lives aboard at least five days a week; the Williams do not pay a live aboard fee on their boat to the marina; to the best of her knowledge the Williams do not live at the marina; and the Williams' boat is large enough to live aboard. Paul Armand, a private investigator, testified that he met Ms. Williams at the warehouse; she indicated she lived on the property in a trailer house as the security guard.

The evidence is legally and factually sufficient to support the trial court's finding that the Harold Williams voted legally because he resided in Kemah. Mr. Williams' permanent address is at the marina in Kemah. He is out of town about two thirds of each month; when he is in town he resides either on his boat at the marina or with Ms. Williams at her parents' home.

Ms. Williams either resides on her husband's boat or with her parents, although she spends several nights at the warehouse in League City as part of her job. Her intention is to live in Kemah. She entered into a contract to buy a house in Kemah in March 1994, and owns other property there. The evidence is legally sufficient to show that Ms. Williams resided in Kemah at the time of the election. Moreover, we do not find the contradictory evidence outlined above renders the evidence factually insufficient to support the court's finding.

### f. Mary Phelps

 Ms. Phelps testified that she lived in Kemah until 1990 in a mobile home on property located at 150 West 5th Street in Kemah; she deeded the property over to her children because they borrowed money to finish paying off the property; the Kemah home is now family property; she continues to pay the water bill at the Kemah home and receives some mail there; she still considers her legal address to be in Kemah; she moved to the Heritage Square Apartments in Dickinson in 1990; she was forced to move because of financial and health problems; her Dickinson apartment is a federal rent-subsidized apartment for which she qualifies because of her health and age; she would still live in Kemah if she could have found subsidized living there; she moved to Kemah when she was a child, lived there with her husband, and raised her children there; the center of her life is still in Kemah with her family and friends; and she considers the Dickinson apartment a temporary residence until she can move back to Kemah.

Two other witness testified as to Ms. Phelp's residency. Frank Patterson testified that Ms. Phelps does not live in Kemah, and that she moved four years ago from Kemah. Kim Fagg testified that she has been the manager for the Heritage Square Apartments for two weeks; she does not know Ms. Phelps; and the complex' business records show that Ms. Phelps is a tenant. She also testified that the complex does not offer medical services to its residents. An exhibit shows that in January 1991, Ms. Phelps listed a Dickinson address on her driver's license renewal application.

Ms. Phelps considers Dickinson her temporary address, and her intention is to return one day. However, intention alone will not suffice to create residency. *Mills,* 377 S.W.2d at 637. Ms. Phelps has resided for four years in Dickinson. From this perspective, her presence there is more than just temporary. We find the evidence factually insufficient to support the trial court's finding that Ms. Phelps voted legally in the Kemah election.

We sustain point of error one as to the trial court's finding on Ms. Phelps. As for the other seven voters, we uphold the trial court's finding that they voted legally.

### Registration

 In point of error three, Slusher contends that the trial court erred in not invalidating the vote of one voter, Robert Laskoskie, because at the time of the election, his

registration was not effective under TEX. ELEC.CODE ANN. § 13.143(a) (Vernon Supp. 1995).[6]

Section 13.143 provides that if a voter's registration application is approved, the registration becomes effective on the thirtieth day after the date the application is submitted to the registrar. The trial court found Laskoskie legally voted in the election. However, the uncontradicted evidence at trial shows otherwise. The voter registration records show the application date for Laskoskie's registration was May 5, 1994, and his registration became effective on June 4, 1994. Laskoskie was unqualified to vote in the May 7, 1994 election. *See* TEX.ELEC.CODE ANN. § 11.002 (Vernon Supp.1995).

There is no evidence to support the trial court's finding that Laskoskie voted legally in the election.

We sustain point of error three.

■ In point of error four, Slusher contends the trial court erred in not invalidating the vote of Harry Kirkpatrick because he was not registered to an address in Kemah. The trial court found that Slusher presented insufficient evidence to show that Mr. Kirkpatrick voted illegally.

Slusher presented two voter registration cards, dated 1988 and 1994, signed by Mr. Kirkpatrick. The cards show Mr. Kirkpatrick's permanent residence address as 104 2nd Street, Kemah, Texas. The cards also show a post office box number in Kemah as Mr. Kirkpatrick's mailing address. Mr. Kirkpatrick initially testified that he lived at 104 Kipp in Kemah, but he also testified that that address was not a residence. He testified that he has lived on his shrimp boat for the past four years; and his shrimp boat is tied up next to Joe Lee's Restaurant in Kemah. Frank Patterson, a Kemah city council member, testified that 104 2nd Street is located not in Kemah but in the city of Clear Lake Shores.

To be eligible to vote, a person must be a qualified voter on the day the person offers to vote; be a resident of the territory covered by the election; and satisfy all other requirements for voting prescribed by law. TEX.ELEC.CODE ANN. § 11.001 (Vernon 1986). A qualified voter is one who is 18 years of age or older; is a United States citizen; has not been determined mentally incompetent; has not been finally convicted of a felony, except under certain circumstances; is a resident of this state; and is a registered voter. TEX.ELEC.CODE ANN. § 11.002 (Vernon Supp. 1995). In this instance, only the requirements in the statutes regarding residency and registration are in dispute.

Sufficient evidence shows that Mr. Kirkpatrick was qualified to vote, that is, he was registered to vote, and that he was eligible to vote because he resided in the territory covered by the election, that is, on his boat docked in Kemah. TEX.ELEC.CODE ANN. §§ 11.01, 11.002.

Slusher cites TEX.ELEC.CODE ANN. § 11.005 (Vernon 1986) to support her contention that Mr. Kirkpatrick's vote is illegal. That section provides:

> If a voter who is erroneously registered in an election precinct in which he does not reside is permitted to vote by an election officer who does not know of the erroneous registration, the votes for the offices and measures on which the voter would have been eligible to vote in his precinct of residence are valid unless the voter intentionally gave false information to procure the erroneous registration.

There was no evidence that Mr. Kirkpatrick intentionally gave false information to procure an erroneous registration. Therefore, his vote under section 11.005 is valid.

We overrule point of error four.

### Conclusion

We find the evidence insufficient to support the trial court's findings that Mary Phelps and Robert Laskoskie voted legally in the May 7, 1994 election. However, the number of illegal votes is insufficient to affect the outcome of the election and the trial court's judgment.

---

**6.** Streater's brief did not include a discussion on the legality of Laskoskie's registration.

Because we find for Streater, we decline to address her cross-point on appeal.

We affirm the trial court's judgment.