Goodman v. Goodman 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-96-028-CV
No. 10-96-029-CV
No. 10-96-030-CV

        TERESA LOUISE GOODMAN,

                                                                                       Appellant
        v.

        COURTNEY GOODMAN,

                                                                                       Appellee
 

From the 66th District Court
Hill County, Texas
Trial Court Nos. 33972A, 33972B & 33972C
                                                                                                    

O P I N I O N
                                                                                                    

          Jimmy Goodman ("Jimmy") died ten days after marrying Teresa Goodman ("Terri"),
having known her for less than a month. After his death, disputes arose between Terri and
Jimmy's grown children from a prior marriage, Courtney and Kirk Goodman. Courtney made
application to be named temporary administratrix. Terri opposed Courtney's motion and applied
for a family allowance. Courtney and Kirk filed a Complaint for the Production of Will alleging
that Terri had possession of Jimmy's will.
          After a hearing, the court ordered Terri to produce Jimmy's will, appointed Courtney as
temporary administratrix, and denied Terri a family allowance. Terri appeals from three separate
orders of the court: Order Appointing Temporary Administratrix (10-96-028-CV); Order for
Production of Will (10-96-029-CV); and Order Denying Family Allowance (10-96-030-CV). The
briefs in Cause Numbers 10-96-028-CV and 10-96-029-CV are identical, and Terri states that the
appeal in the former is filed "to preclude a finding of waiver or collateral estoppel" in the latter. 
BACKGROUND
          Jimmy was a fifty-one-year-old automobile mechanic who owned his own shop in Blum. 
He and his first wife, Elsa, divorced in 1991 after twenty-eight years of marriage. By all
accounts, he had a good relationship with their children, Courtney and Kirk. Jimmy also owned
approximately forty-eight acres of pasture land on which he and his children raised cattle.
          Jimmy married Terri on June 14, 1995, but he died of a massive heart attack around 2 a.m.
on Saturday, June 24. The problems between the parties began within hours of his death. Terri
and her relatives arrived at Jimmy's shop around 7:30 a.m. She testified that she removed
records, files, and other items from the shop for "safekeeping," putting them in the trunk of her
cousin's car. Some of Jimmy's friends and relatives also arrived at the shop after Terri, and they
testified that Terri took guns as well as files.
          Courtney and Kirk, neither of whom live in Blum, arrived Saturday evening. They
testified that when they went to their father's shop the next day, records and files were missing. 
Early Monday morning, Terri attempted to cash a check on Jimmy's bank account, but the bank
refused. The evening of the funeral, Terri moved Jimmy's wrecker from the shop. The following
morning, Courtney applied for and was appointed temporary administratrix.
the widow
          Terri testified that she and Jimmy were in love, that he gave her his pickup as an
engagement present, and that she did not find a will among Jimmy's papers. She estimated the
value of his estate at $600,000. She testified that she had no separate property and sought a family
allowance of $60,000.
the children
          The children paint an unflattering portrait of Terri as a much-married woman whose
previous husbands and boyfriends had met with untimely deaths. They believe that Jimmy kept
a will in his shop filing cabinet leaving them all his property and naming Kirk as executor. They
argue that Terri removed the will from the filing cabinet because, without the will, she would be
entitled to a portion of the estate under the laws of intestate succession. Tex. Prob. Code Ann.
§ 38 (Vernon 1980). The children attempted to show that Terri had used a series of transactions
to protect property from a prior marriage from her creditors.
EVIDENCE
teresa goodman
          Terri testified that she had "known of" Jimmy two years before they married. She said that
on the night Jimmy proposed, he gave her his 1992 Chevrolet truck as an engagement present
because she was driving her son's old El Camino. She said that before his death, Jimmy had given
her his "important papers," including health insurance, deeds, bank statements, and cattle records.
          Terri stated that, after Jimmy's death, she took paperwork from the shop filing cabinet for
safekeeping. However, she denied that she ever had Jimmy's will: "[T]here was absolutely no
Will in my possession ever at any point." She testified that Jimmy had told her he had "taken care
of everything" and was "drawing up new paperwork." Terri denied taking any guns from the
shop.
          Terri stated that Jimmy had written a check to her cousin, Kelly Herring, "for taking care
of us, the laundry, the food and the rent, or just a gift of love for caring about us and letting us
stay there." Terri initially testified that she and Kelly went to the Rio Vista Bank early Monday
morning to cash the check and make a deposit.


 She later testified


 that she "wanted to go for a
ride and try to be by myself," so she took the check to the bank for Kelly. The drive-through
teller refused to cash the check and asked her to come inside. The bank again refused to cash the
check.
          Terri testified that she did not own any property and that she is "totally medically disabled"
due to fibrotic lung disease which caused the surgical removal of her right lung in 1969. She also
testified about her prior marriages and relationships. Her third husband, Hal LaPlace, executed
an "Affidavit of Facts" in October 1985 declaring an informal marriage to Terri and giving her
an "equal ownership in all existing possessions," including real property at Echo Lake in
Henderson County.


 Hal executed a power of attorney on January 6, 1987, authorizing Terri to
dispose of the property at Echo Lake.


 On January 13, Terri used the power of attorney to convey
the Echo Lake property to Kimberli Finn, her daughter by a prior marriage. On January 20,
Kimberli conveyed the property to Terri as "individual trustee." On March 24, RepublicBank
took a judgment against Hal and Terri for almost $21,000. Terri denied that the conveyances had
been an effort to avoid creditors. 
          Terri said that she had not worked since 1969. However, she denied that her husbands had
supported her and said that she had supported herself and her three children. She testified that she
had received a settlement for the loss of her lung in 1969.


 Terri estimated the value of Jimmy's
automotive tools at $350,000 and his total estate at almost $600,000. She testified that she needed
a family allowance of $60,000.
bank employees
          Three Rio Vista Bank employees testified. Barbara Tubbs, a loan secretary and Goodman
family friend, testified that she had been at Jimmy's mother's house the Sunday evening after
Jimmy's death. Courtney and Kirk asked her to "make the bank aware" of their father's death. 
When Tubbs arrived at the bank around 7:45 a.m. Monday morning, she saw Jimmy's pickup in
the drive-through line. She informed the drive-through teller of Jimmy's death, and Terri was
asked to come inside the bank.
          Betty Prather, a supervisor of new accounts, testified that she was asked to assist a woman
who was trying to cash a check for approximately $600 on Jimmy's account. Prather, who knew
of Jimmy's death, pulled the account's signature card. She did not believe that the signature on
the check matched the one on the card. After getting a second opinion from Ruth Korb, the head
teller, Prather returned the check to the woman, whom she identified as Terri.
          Ruth Korb testified that she compared Jimmy's signature on the signature card to that on
the check and determined that "it was not the same signature." Korb advised Prather not to cash
the check.
Kirk Goodman
          Kirk Goodman, Jimmy's thirty-one-year-old son, testified about the existence of his
father's will. In late 1992 or early 1993, Kirk and Jimmy were working at the shop when Jimmy
said, "Come here, I want to show you something; something I need to tell you." Jimmy pulled
a folder containing a will from the second drawer of the filing cabinet. He handed the folder to
Kirk, who was "kind of unnerved" and could not look at it. Jimmy explained that Kirk was to be
the executor of the will and that he and Courtney were the heirs. Jimmy told Kirk that "in the
event of his death," the will would be in the filing cabinet.
          Kirk testified that his father's filing cabinet was "full of paperwork from top to bottom"
with insurance papers, tax returns, business records, and cattle records. After Jimmy's death,
Kirk said the drawers had been "rifled through." "[Q]uite a bit of the information and stuff was
missing. Drawers [were] half full and there was one that was completely emptied, and there was
one on the bottom that was pretty empty."
jackie kyle
          Jackie Kyle, Jimmy's brother-in-law, testified that he had known Jimmy since he was seven
years old. Jimmy told Kyle that he had a will, that the will was kept in the filing cabinet, and that
it "left his stuff . . . to the children and Kirk would administrate." Kyle had the impression that
Jimmy had written the will himself. He said Jimmy first mentioned the will in 1992, and that they
discussed it again in 1993 or 1994.
          Kyle learned of Jimmy's heart attack around 2 a.m. Saturday morning. He and his wife
drove to the hospital, but Jimmy was dead by the time they arrived. Kyle returned home and "got
in touch with [Jimmy's] kids." Around 7:30 a.m., Kyle was getting gasoline when he saw Terri
and her cousin Kelly drive by in Kelly's car. The car stopped at Jimmy's shop and backed up to
the door. Kyle drove to the shop where he saw Terri, Kelly, and a woman named Millie. Terri
was in the shop office removing files from the filing cabinet. Kyle saw two guns—one of Jimmy's
and one of Kirk's—in the trunk of the car. Kyle testified, "Well, I just told everybody there that
I felt like they ought to wait until the kids got there. The kids were on their way." The women
did not stop. Kyle was "upset" and left as Jimmy's mother and sister arrived.
melva scott
          Melva Scott, Jimmy's sister, testified that she and her mother saw Terri at the shop around
8 a.m. the morning of Jimmy's death. Terri told Melva that Jimmy had asked her to "go through
his records and straighten them out" and that she was looking for the insurance policy for the
funeral home.
ray mahan
          Ray Mahan, an insurance salesman and auctioneer, testified that he had looked at all of
Jimmy's tools and had given Courtney a figure for the estate's inventory, but could not remember
the exact figure. He testified that the cattle, if sold to raise cash, were worth approximately
$8,300.
travis sanders
          Travis Sanders testified that he paid Jimmy $579 in cash around noon on the Friday before
his death.
elsa goodman
          Elsa Goodman testified that she divorced Jimmy after twenty-eight years of marriage
because of his drinking. She stated that they maintained a "very civil" relationship after the
divorce and that he was an excellent father. After the divorce, Jimmy told her that he had written
a will dividing his property between the children and naming Kirk as executor. She said that he
kept it in the shop filing cabinet with his other papers, but that she had never seen it.
          Elsa testified that she was a school teacher, that while they were married she made more
money than Jimmy did, and that their joint income for 1991 was just under $30,000. She stated
that Jimmy's income from the shop was usually $16,000 to $17,000, but that he usually lost
$9,000 to $10,000 on the cattle for a net income of $6,000 to $7,000 a year. 
doyle higgins
          Doyle Higgins, a sheet metal fabricator whose shop was across the street from Jimmy's,
testified that he and Jimmy were "like brothers." He spoke with Jimmy almost every day for
eighteen years. Higgins said he had made his own will in the 1960's and that he had "needled"
Jimmy a dozen times over the years to make a will. After Jimmy's divorce, Higgins told him that
"it would behoove him to make a Will out." Jimmy told Higgins "about a year ago"


 that he had
made a will and had put it in his filing cabinet. Jimmy told him that he had "left everything to the
kids" but did not say anything about an executor.
           Higgins stated that, after their marriage, Jimmy and Terri had made an offer on a house
in Blum. Jimmy was concerned about how they would pay for it. Jimmy told Higgins that Terri
"had offered to sell her place, but [Jimmy] didn't want to do that. . .[because] that was hers and
her kids."
bill mcalister
          Bill McAlister testified that six or seven years ago he had sold Jimmy the forty-eight acres
of land for cattle grazing. Jimmy bought the property for $50,000, paying $500 a month. 
McAlister stated that occasionally Jimmy had gotten behind in his payments, but would catch up. 
At the time of his death, however, Jimmy was four months behind—further than he had ever been.
jim david fox
          Jim David Fox testified that he knew Jimmy through his business. He had known Terri
since the late 1960's when she and her first husband lived next door to Fox in Grand Prairie. Fox
also knew two of Terri's later husbands. He testified that Terri told him she was making
pornographic movies and modeling in Houston. Fox learned of Terri's marriage to Jimmy the
night before his death, and when he learned of Jimmy's death, called the sheriff's department and
Jimmy's mother to suggest that an autopsy be performed.


 Fox denied that he was testifying
against Terri because she had refused his sexual advances.
courtney goodman
          Courtney Goodman, Jimmy's twenty-eight-year-old daughter, testified that her father kept
his will in the filing cabinet. She had not seen the will, but her father had told her that it left
everything to her and Kirk and that Kirk was the executor.
          Courtney first went to Jimmy's shop on the Sunday after his death. She testified that
several items were missing: cattle records; insurance and personal papers; "current billings, the
people who he had done work for that owed him money"; guns; and his "money sack." On
Monday morning, Courtney discovered that Terri had tried to cash a check on her father's
account. On Tuesday evening, after the funeral, the wrecker disappeared from the shop. 
Courtney called friends who helped her board up the shop and move the remaining contents to
another location. The following morning, Courtney applied for and was appointed temporary
administratrix of her father's estate.
          Acting as temporary administratrix, Courtney found that her father had four accounts at
Rio Vista Bank. One account was a savings account for his granddaughter Lacey. One account
had $13, a savings account had $1,100, and his business account—on which Terri had attempted
to cash the $600 check—had a balance of $683. She testified that there was no deposit reflecting
the $580 cash payment Travis Sanders had made to Jimmy the afternoon before his death. 
Courtney stated that her father's tax returns showed he had made $15,000 in 1991 and 1994 and
that he usually lost money on his cattle operation. Courtney estimated the value of Jimmy's entire
estate at $61,000.
kelly herring
          Kelly Herring testified that she is Terri's second cousin and had lived in Blum for five
years. She testified that Terri met Jimmy the last week of May 1995 when Jimmy was working
on Kelly's car. Terri drove Kelly to pick up the car at Jimmy's shop, and Terri and Jimmy "hit
it off." Kelly said their relationship was "like magic" and that "they were crazy about each other." 
From their first date on June 2, Jimmy began staying with Terri at Kelly's house. Kelly testified
that Jimmy gave Terri his truck during their courtship.
          Kelly testified that she, Terri, her sister-in-law, and her brother-in-law went to Jimmy's
shop early Saturday morning. When they arrived, there were papers on the floor and "everything
looked like it had been ransacked." They loaded files, receipts, and empty gun cases into her car
trunk. Kelly stated that two guns belonging to her son and grandson were in the trunk. She stated
that Jackie Kyle "may have said" they should wait until Jimmy's children arrived, but they did not
wait.
          Kelly testified that Terri had a lot at Echo Lake, but she did not know of any other real
estate.
ORDER FOR WILL PRODUCTION & ORDER FOR APPOINTMENT
OF TEMPORARY ADMINISTRATRIX
(10-96-028-CV & 10-96-029-CV)
          The court made the following findings of fact:
The Court finds that James Arthur Goodman, hereafter referred to as Deceased, had
a written will at the time of his death.
 
The Court finds that Teresa Louise Goodman had possession of the will of James
Arthur Goodman and other papers at the time the sworn written complaint of Courtney
Goodman and James Kirk Goodman, children of Deceased was filed.
 
The Court finds that Teresa Louise Goodman has not shown cause why she should
not deliver the will of Deceased to the Court for probate or deliver other papers to the
Temporary Administratrix.

The court made the following conclusion of law:
 
The Court should order Teresa Louise Goodman to deliver the Will of James
Arthur Goodman by November 2, 1995, as the Court is satisfied that she had such papers
or will at the time of the filing of the complaint in accordance with Probate Code Section
75, Duty and Liability of Custodian of Will.
points of error
          In point one in each of the two appeals, Terri challenges the legal sufficiency of the
evidence to support the court's finding that Jimmy had a written will at the time of his death. In
reviewing a "no evidence" point, we consider only the evidence and inferences tending to favor
the finding, viewed most favorably in support of the finding, and disregard all contrary evidence
and inferences.


 Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993). If there is
more than a scintilla of evidence to support the finding, the no-evidence challenge fails. Id.
          Kirk testified that his father had a will, that his father handed him the folder with the will,
but that he did not read it. Jackie Kyle testified that Jimmy told him he had a will, which Kyle
believed Jimmy had written himself. Elsa Goodman testified that Jimmy had told her he had a
will. Doyle Higgins testified that he had "needled" Jimmy about making a will and that Jimmy
told him "about a year ago" that he had made a will. Kirk, Courtney, Elsa, Kyle, and Higgins
testified that (1) Jimmy said the will left his property to Kirk and Courtney and (2) the will was
kept in the shop filing cabinet.
          Viewing the evidence in the light most favorable to the finding and disregarding evidence
and inferences to the contrary, we find there is probative evidence to support the court's finding
that a will existed. Id. We overrule points one.
          Terri's second point in these appeals challenges the factual sufficiency of the evidence to
support the court's finding that Jimmy had a written will at the time of his death. A court's
findings of facts are reviewed for factual sufficiency of the evidence under the same legal
standards as applied to review jury verdicts for factual sufficiency. Ortiz v. Jones, 917 S.W.2d
770, 772 (Tex. 1996). We must weigh all of the evidence, and we overturn the finding only if it
is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. 
Id. (citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)).
          In conducting such a review, we give deference to the court's determination of the
witnesses' credibility and the weight to be given their testimony. Slusher v. Streater, 896 S.W.2d
239, 243 (Tex. App.—Houston [1st Dist.] 1995, no writ). The court, as the trier of fact regarding
conflicting evidence, may believe one witness and disbelieve others, and it may resolve
inconsistencies in the testimony of any witness. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697
(Tex. 1986).
          Based on all of the evidence in the record, much of which we have recited, we cannot say
that the court's determination that Jimmy left a will is so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust. Ortiz, 917 S.W.2d at 772. We
overrule points two.
          Having determined there was sufficient evidence that the will existed, we turn to the
question of Terri's possession of it. In points three and four, Terri challenges the legal and factual
sufficiency of the evidence to support the court's finding that she had possession of the will at the
time the motion to compel production was filed.
          We first view the evidence in the light most favorable to the finding and disregard evidence
and inferences to the contrary. Browning-Ferris, 865 S.W.2d at 928. Terri does not dispute that
she removed paperwork from the shop filing cabinet on the morning of Jimmy's death. Melva
Scott saw Terri at the shop around 8 a.m. Terri told her that Jimmy had asked her to "go through
his records and straighten them out" and that she was looking for the insurance policy for the
funeral home. Jackie Kyle saw Terri going through files from the filing cabinet. Courtney
testified that records and personal papers were missing from the shop on Sunday. Kirk testified
that his father's filing cabinet had been "full . . . from top to bottom," but that he found the files
"rifled through" with drawers either empty or half-empty.
          Given the testimony that the will was located in the filing cabinet prior to Jimmy's death
and its absence after Terri removed papers from the shop, we find probative evidence to support
the court's finding. Id. We overrule point three in each appeal.
          Looking at all of the evidence that bears on the question of possession, we next look to
whether the finding is so against the great weight and preponderance of the evidence as to be
clearly wrong and unjust. Cain, 709 S.W.2d at 176. Again, we must acknowledge that the court
had the discretion to believe one witness over another and to resolve any conflicts in the testimony. 
McGalliard, 722 S.W.2d at 697. Inferences may support a judgment so long as they are
reasonable in light of all of the evidence. Ortiz, 917 S.W.2d at 772.
          It is undisputed that Terri removed files from the filing cabinet in which several witnesses
testified Jimmy kept his will. However, Terri denied that she had the will, stating that "there was
absolutely no Will in my possession ever at any point." Her cousin Kelly testified that they
removed files, but stated that the shop had looked "ransacked" when they arrived. This evidence,
although contrary to the finding, is not in our view so great as to overwhelm the inference that
Terri removed the will from the shop. Thus, we overrule point four in each of the two appeals.
ORDER DENYING FAMILY ALLOWANCE
(No. 10-96-030-CV)
          Section 286 of the Probate Code provides:
          § 286 Family Allowance to Surviving Spouses and Minors
(a) Unless an affidavit is filed under Subsection (b) of this section, immediately
after the inventory, appraisement, and list of claims have been approved, the court shall
fix a family allowance for the support of the surviving spouse and minor children of the
deceased.
 
(b) Before the approval of the inventory, appraisement, and list of claims, a
surviving spouse or any person who is authorized to act on behalf of minor children of the
deceased may apply to the court to have the court fix the family allowance by filing an
application and a verified affidavit describing the amount necessary for the maintenance
of the surviving spouse and minor children for one year after the date of the death of the
decedent and describing the spouse's separate property and any property that minor
children have in their own right. The applicant bears the burden of proof by a
preponderance of the evidence at any hearing on the application. The court shall fix a
family allowance for the support of the surviving spouse and minor children of the
deceased.
Tex. Prob. Code Ann. § 286 (Vernon Supp. 1996). Subsection (b) was added in 1993. Prior
to that time, a family allowance was contemplated only as provided in subsection (a), i.e., after
the inventory, appraisement, and list of claims had been court-approved.
          Other sections of the Probate Code also apply. Section 287 states that a family allowance
is determined "with regard to the facts or circumstances then existing and those anticipated to exist
during the first year" after the death. Id. § 287 (Vernon 1980). Section 288 provides that "no
such allowance shall be made for the surviving spouse when the survivor has separate property
adequate to the survivor's maintenance . . . ." Id. § 288 (Vernon 1980).
findings of fact & conclusions of law
          The court's order denying Terri's request for a family allowance states:
The court considered the application for family allowance filed by Teresa Louise
Goodman. After consideration of facts and circumstances existing and anticipated to exist
during the first year after the death of James Arthur Goodman, the Court found that the
facts and circumstances to not support the necessity for a family allowance.
The court's applicable findings of fact state:
The Court finds that Teresa Louise Goodman and Deceased were married for ten
(10) days and Deceased had no minor children and, after considering her separate property
and other evidence, that Applicant did not show by preponderance of the evidence the
necessary [sic] for her maintenance.
 
Teresa Goodman has adequate separate property for her maintenance during the
year following James Arthur Goodman's death.

The court made the following conclusion of law:
 
Teresa Louise Goodman's application for family allowance should be denied
because she failed to meet her burden of proof by a preponderance of the evidence on her
application for family allowance.
points of error
          Terri appeals on five points, attacking the court's failure to set a family allowance and its
finding that she had adequate separate property for her maintenance. Terri's application for a
family allowance states that no inventory had been filed; thus, she bore the burden to prove the
necessary facts by a preponderance of the evidence. Id. § 286(b). 
          In points one and three, Terri asserts that she proved "as a matter of law": (a) the amount
necessary for her maintenance and (b) that she did not have adequate separate property to maintain
herself. See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). We will address
point three first. 
          On such "matter-of-law" points, we must first examine the record for evidence that
supports the negative finding, while ignoring all evidence to the contrary. See id.; Holley v.
Watts, 629 S.W.2d 694, 696 (Tex. 1982). If we find evidence that supports the negative finding,
the inquiry ends; but if we find no evidence to support the finding, then the entire record must be
examined to determine if the contrary proposition is established as a matter of law. See Sterner,
767 S.W.2d at 690. If so, the point will be sustained.
          Under section 287, Terri had to show "the facts or circumstances then existing and those
anticipated to exist during the first year" after Jimmy's death. Tex. Prob. Code Ann. § 287. 
Terri also bore the burden of proving she did not have adequate separate property for her
maintenance. Id. § 288. Sections 286 and 287 have been construed to mean that "the widow's
allowance must be made `with reference to the condition of the whole property [of the deceased's
estate] during the first year of [his] death,' and with reference to the widow's necessities
`measured by [her] condition in life, and by what [she] had been accustomed to have during the
lifetime of the husband.'" Kennedy v. Draper, 575 S.W.2d 627, 629 (Tex. Civ. App.—Waco
1978, no writ) (citations omitted). Thus, the court was entitled to consider evidence of the
condition of Jimmy's estate and Terri's necessities measured by her condition in life, and by what
she had been accustomed to during Jimmy's lifetime. Id.


 
          Terri's affidavit, attached to her application for family allowance, stated her monthly
expenses to be approximately $5,450. She requested a family allowance of $60,000. The
evidence viewed in light of the court's negative finding shows the "condition" of Jimmy's estate
was that of a man whose net income was $6,000 to $7,000 a year and who was four months behind
on his land payments. Terri's "widow's necessities"—measured by her "condition in life" and
"what she had been accustomed to" during Jimmy's lifetime—were limited by the ten-day
marriage. There were no minor children. Terri's cousin, Kelly, testified that Terri owned the
Echo Lake property. Doyle Higgins testified that Jimmy said that Terri "had offered to sell her
place" to finance a home in Blum, but that Jimmy didn't want to do that because that was "hers
and her kids."
          Given the standard of review—under which all evidence contrary to the finding must be
disregarded—we find some evidence of the existence of separate property adequate for Terri's
maintenance. Sterner, 767 S.W.2d at 690. Thus, the court's failure to award Terri a family
allowance is supported by legally-sufficient evidence. Id.; Tex. Prob. Code Ann. § 288. We
overrule point three. Because section 288 precludes a family allowance, we do not reach point
one.
          In points two and four, Terri asserts the court's determinations are "against the great
weight and preponderance of the evidence." Thus, we sustain the court's "failure to find" unless,
considering all the evidence, that finding is contrary to the great weight and preponderance of the
evidence. Ames v. Ames, 776 S.W.2d 154, 158 (Tex. 1989), cert. denied, 494 U.S. 1080, 110
S.Ct. 1809, 108 L.Ed.2d 939 (1990). Again, we address point four first. 
          Terri testified to the life she hoped to have with Jimmy, including buying a house or
double-wide trailer. She testified that she had no separate property and that she was "totally
disabled." She estimated Jimmy's tools at $350,000 and his total estate at $600,000. She claimed
Jimmy's 1992 truck as her separate property because it had been a gift from Jimmy.
          Except for Terri's assertions, the evidence was consistent that Jimmy made about $15,000
a year in his mechanic's shop and that he lost money on his cattle operation. He was behind on
his land payments. Other evidence shows Jimmy's entire estate to be valued at approximately
$60,000. Although Terri denied owning separate property, her cousin believed that she owned
property. The deeds to the property and the testimony raise questions about whether creditors
were evaded. According to Doyle Higgins, Terri had offered to "sell her place" to finance a home
in Blum.
          Given these facts, we cannot say that the finding that Terri owned separate property
adequate for her maintenance was against the great weight and preponderance of the evidence. 
Id. We overrule point four. As above, because the finding of adequate separate property
precludes a family allowance, we do not reach point two.
          In her fifth point, Terri asserts that the court abused its discretion in "totally denying" her
application for a family allowance. Because the estate's value is in dispute and inventories had
not been filed, the parties went into the hearing "concerned that the Court [might] not have enough
information to set a family allowance at this point." Having found sufficient evidence to support
the court's failure to award a family allowance, we cannot say that the court acted without any
guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). We overrule
point five.
          We affirm the orders of the probate court.
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed August 30, 1996
Do not publish