NUMBER 13-07-00704-CV


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


ARTURO GONZALEZ, JR. 

AND ESPERANZA OCHOA , Appellants,


v.
 


DOMINGO VILLARREAL 

AND ELMA GARZA, Appellees.

 


On appeal from the 275th District Court of Hidalgo County, Texas.


 


OPINION



Before Chief Justice Valdez and Justices Yañez and Benavides


Opinion by Chief Justice Valdez



 This is an accelerated appeal in an election contest. Appellants, Arturo Gonzalez
and Esperanza Ochoa, appeal from the trial court's order voiding an election and ordering
a new election in places four and five of the board of trustees for the La Joya Independent
School District ("La Joya ISD"). By three issues, appellants argue that (1) the trial court
erred in voiding the election, (2) there were no irregularities in the appointment of elections
officials, and (3) the trial court erred in allowing testimony alleging a conspiracy because
there was no corroborating evidence. We affirm.

I. BACKGROUND Arturo Gonzalez and Elma Garza were incumbent members of the La Joya School
Board who sought reelection on the May 12, 2007 ballot. Gonzalez and Garza were
members of different political camps. Gonzalez supported Esperanza Ochoa
("Contestees") in her campaign against Garza. Elma Garza supported Domingo Villarreal
("Contestants") in his bid against Gonzalez. The final election results revealed that
Gonzalez garnered 2,624 votes against Villarreal's 2,303 and won by 322 votes. (1) Ochoa
garnered 2,678 votes to Garza's 2,275, producing a 403 vote victory margin. 

 On June 15, 2007, Garza and Villarreal filed an election contest. They alleged,
among other things, that La Joya school board members and administrators allowed
unauthorized persons to serve as election judges and clerks ("election officials"). 
Contestants also alleged that election officials (1) allowed ineligible individuals to vote, (2)
prevented eligible voters from voting, (3) improperly relocated voting machines, and (4)
engaged in fraud. The allegations of fraud and appointment of an unauthorized election
judge focus on an alleged conspiracy between other members of the school board and
local political figures to rig the election by appointing a biased election judge. Contestants
argue that in an otherwise very close district wide election, fraud is evidenced by the
lopsided outcome at polling sites in which an illegally appointed and biased election judge
presided. (2)

 Gonzalez and Ochoa answered with a general denial and a counter action for
negligence and civil conspiracy. Additionally, Contestees sought sanctions and declaratory
relief. After discovery and several pretrial hearings, a bench trial commenced on October
3, 2007. 

 Generally categorized, the evidence touches upon the (a) appointment of Aida Rivas
as election judge, (b) testimony of Alejandra Rodriguez, an election clerk, (c) qualifications
of certain election clerks, (d) voter registration rolls, combination forms, and provisional
ballots, (e) testimony of Contestant Elma Garza, ( f) evidence of an alleged conspiracy, and
(g) evidence of the internal investigation into election code violations.

A. Appointment of Aida Rivas as Election Judge

 Sofia Villarreal, an administrator with the La Joya School District, and Irma Herrera,
secretary to the La Joya School Board, testified regarding the appointment of Aida Rivas,
the election judge who presided over early voting at Lloyd Bentsen Elementary and election
day voting at E. B. Reyna Elementary. 

 As school board secretary, Herrera maintains the school board's agenda and
minutes. In addition to Herrera's testimony, several school board agendas and minutes
of school board meetings were admitted into evidence. Herrera testified that the school
board appointed Irene Garcia as the early voting election judge for Bentsen Elementary
and election day judge for Reyna Elementary on March 7, 2007. (3) 

 Garcia is an elected trustee of the South Texas Community College Board of
Trustees. Because she is an elected official, Garcia could not serve as an election judge. 
Tex. Elec. Code Ann. § 32.052 (Vernon 2003). By a letter dated March 19, 2007, Garza
and Domingo Villarreal notified Joel Garcia, then president of the school board, that Irene
Garcia was statutorily disqualified from serving as an election judge. The record, however,
does not contain any minutes, agendas, or formal directives rescinding Irene Garcia's
appointment or appointing Rivas as election judge. Herrera did not testify as to how Rivas
was ultimately appointed election judge. 

 Sofia Villarreal had no prior election administration experience. Nevertheless, Sofia
Villarreal was designated the election administrator for the school board election and was
in charge of conducting the election. (4) Sofia Villarreal testified that school board members
recommended individuals to serve as election judges for particular polling sites and as
election clerks and that John Alaniz, a school board member, recommended Aida Rivas. (5) 
The recommendations, however, were not formal board actions. On April 11, 2007, Sofia
Villarreal wrote a note to Alda Benavides, superintendent of schools, notifying her that
Rivas would serve as an election judge. The only official documentation of Rivas's
authority to serve as an election judge is a letter from Sofia Villarreal to Rivas dated April
13, 2007. 

 Contestants argued that Villarreal's letter to Rivas is merely a notice of selection and
does not properly evidence Rivas's appointment because there is no formal notice or
hearing and because no public record exists of the election authority--the school board
in this case--making the appointment. Contestees argued that the election judge's
vacancy occurred within twenty days of the election, allegedly as evidenced by Villarreal's
informal note to Benavides, (6) and that Rivas's appointment was made on an emergency
basis without the need for public notice or hearing. Indeed, the record does not contain
any formal action explaining how Rivas was appointed election judge or who was
responsible for her appointment.

 In an effort to have an outside authority administer the election, Contestant Elma
Garza, a school board member, moved to have the Hidalgo County Election Administrator
run the upcoming election at an April 25, 2007 school board meeting. Her motion was
defeated by a vote of four-to-three. Joel Garcia, Elma Garza, and Joe Aguilar voted for the
motion. Jose Salinas, Rita Garza-Uresti, Auturo Gonzalez, and John Alaniz voted against
the motion. With the defeat of Garza's motion, the administration of the election rested in
the school district's hands.

 Early voting began on April 30, 2007, and Rivas served as election judge for early
voting at Bentsen Elementary until May 8, 2007. Subsequently, Rivas served as election
judge on May 12, 2007, election day, at Reyna Elementary and she was assisted by
several election clerks. 

B. Testimony of Election Clerk Alejandra Rodriguez

 Alejandra Rodriguez, a social acquaintance of Rivas, testified about her encounters
with Rivas before and during the election. Rodriguez testified that Rivas engaged in
improper activity by (1) engaging in pre-election conversations that evidence a bias
towards Contestees' political camp, (2) allowing unregistered voters to vote, (3) failing to
catalogue voters' addresses on required lists, known as combination forms, (7)
 and (4) giving
preferential treatment to Contestees' supporters. 

1. Pre-Election Conversations

 Although Rivas was not officially notified of her selection as an election judge until
April 13, 2007, Rivas asked Rodriguez in March of 2007, to serve as an election clerk for
an election that Rivas was judging. Before the election, Rivas took Rodriguez to a political
function where Rodriguez was introduced to Kino Flores, a local political figure. Rodriguez
testified as to a conversation between Flores, Rivas, and herself: 

After I was introduced, she said-he said that I if was going to be [out]side
[sic] working, and she said, no, that I [was] going to be inside, that she
wanted me inside. And then he said that if she had enough drivers to bring
in voters. And she said, no, but I'll get them for you. And he asked me how
many votes I was going to bring in, and I said 15.


Rodriguez worked as an election clerk under Rivas but was never administered an oath. 

2. Votes by Unregistered Voters

 Rodriguez testified that voters who were not on the registration rolls and did not
have voter registration cards were allowed to vote with only their identification cards. 
According to Rodriguez, election officials were to call the election administration office to
determine whether an individual was properly registered to vote if he or she was not on the
registration rolls and did not have a voter registration card. Rivas, however, instructed
Rodriguez not to do so. Rodriguez recounted that

. . . a lot of times, most of the times, Aida [Rivas] would tell me that county
was taking too long and for me to go ahead and add them because she
knew them and they were good voters. And I would tell her, like, county
hasn't confirmed and they don't have voter registration card[s], and she
would shut me up quickly. I'm going to quote her. I'm not asking for your
opinion. You do as I say here. So I would add them on [to the voter
registration rolls].


Rodriguez testified that these individuals whose names did not appear on the voter
registration rolls and who could not produce voter identification cards were added to the
voter registration rolls by hand, signed into the combination forms, and were allowed to
vote on the voting machines. 

3. No Addresses on Combination Forms

 The record contains combination forms for April 30, 2007, which reveal that none
of the voters on the list for that date have corresponding addresses, but do contain precinct
and voter registration numbers. Contestants argued that the vast majority of individuals
who voted at Rivas's polling site on April 30, 2007, were allowed to vote on the machines
without a proper record being made of their eligibility to do so. (8) They concluded that
without corresponding addresses, a voter's eligibility cannot be ascertained from a review
of the combination forms. 

 When asked about the absence of addresses on the combination forms, Rodriguez
testified that "I was instructed by Mrs. Rivas not to [write down addresses] because it was
going to take more time and we were shorthanded." Contestants contend that Rivas's
dereliction contributed to the counting of illegal or ineligible votes and evidenced a
conspiracy to perpetrate fraud on La Joya voters. As discussed below, the disheveled
election records make the propriety of votes difficult to ascertain.

4. Preferential Treatment & Suspect Motives

 Rodriguez testified that Rivas would give preferential treatment to the Contestees'
supporters. For example, when Contestees' supporters would mistakenly enter the polling
place, Rivas would nicely tell them to leave, while Contestants' supporters were rudely told
to "get out." Additionally, Rodriguez testified that Rivas would manipulate voters into
allowing her to assist them in voting. (9) Voters who presented themselves with voting
assistants known to support the Contestees proceeded through the sign-in and voting
process undisturbed. Voters who presented themselves with voting assistants known to
support the Contestants were confronted with exacting questions. Rodriguez averred,
"[Rivas] would tell the voters, you need assistance, right[?] And they would reply, yes. And
then, like, I can help you if you like or do you want [your assistant] to help. You know, she
was in their face already, and they would say, oh it doesn't matter, and she would assist
them."

 Two other individuals testified that election workers at Bentsen Elementary favored
Gonzalez and Ochoa. First, Irma Pena testified that Rivas told her to vote for the people
with the "little buses." (10) Dora Saenz testified that a female election worker voted for her
and that she did not press any buttons. She did not get the election worker's name, but
she testified that she wanted to vote for Villarreal and Garza. She also filed a complaint
with the La Joya ISD police.

 Alejandro Perez, a La Joya ISD police officer, and Sofia Villarreal received
numerous complaints from both political camps regarding Rivas, and investigated the
situation. According to Rodriguez, the complaints agitated Rivas. Rodriguez described
Rivas's reaction to the stress of the investigations:

She told me - because I got upset with her. She had yelled at me, and I told
her not to be doing that in front of the voters, that I wasn't going to permit
that. So she yelled at me once again, and I got up and left my post, and she
told me that she was sorry but that she was under a lot of stress because
there was people - that's how she said it - that wanted - wanted her out of
there. And she said, but I'm not worried about it. There's a lot of stress. I'm
not worried because Kino Flores has my back. And I told her, I don't care
who he is, you don't yell at me. That's [sic] it's not okay for you to yell at me
because you are under stress.


 Rodriguez concluded her testimony by stating that in her eyes, Rivas's preferential
treatment of some voters affected the outcome of the election.

C. Qualifications of Certain Election Clerks

 Several election clerks testified regarding their appointments and qualifications. 
Gloria Amador testified that her sister-in-law supported Contestees and that during early
voting, she would assist voters who wanted to vote for Contestees. While Amador was
waiting outside Bentsen Elementary, Rivas approached and asked her if she wanted to be
an election clerk. Amador understands English and "can read it a little bit." She testified
that as an election clerk, she witnessed hundreds of names added to the voter registration
rolls because they were cleared by the Hidalgo County Elections Administration. Thus,
there is a contradiction between Rodriguez's and Amador's testimony about whether voter
names were properly added to the registration list. After the election, Amador began
employment as a bus driver for the La Joya School District. 

 Max Montelongo was an early voting election clerk, but on election day he
transported voters to the polls so that they could vote for Contestees. Montelongo testified
that Rivas found him standing in the Bentsen Elementary parking lot and asked him to be
an election clerk. Montelongo agreed, even though he does not understand English and
cannot read or write. Aleida Cruz, a poll watcher, testified that Montelongo exclaimed to
Rivas, "Irene sent me," when he walked into the Bentsen Elementary polling place. (11) There
was, thus, a contradiction in testimony regarding how and who selected Montelongo to be
an election clerk. 

 Linda Tijerina testified that Irma Herrera called her and asked if she would be an
election clerk. She served as an election clerk at Bentsen Elementary. Tijerina does not
understand English.

D. Voter Registration Rolls, Combination Forms, and Provisional Ballots

 In addition to the testimony of how election officials conducted themselves,
numerous voter registration rolls (12) and combination lists were admitted. They are
organized by precinct number and contain an alphabetized list of individuals' names, voter
registration numbers, addresses, and dates of birth. The rolls are printed by the County
Election Administrator and delivered to local election officials for use during the election. 
Also admitted were numerous combination forms used at Bentsen Elementary, Reyna
Elementary, and the Sullivan City fire station polling sites. (13) 

 In addition to the registration rolls and combination lists, there was testimony about
other documentation used in the election. Teresa Navarro, the Hidalgo County Elections
Administrator, testified that her office maintains an online database of registered voters. 
Any individual with access to the Internet can ascertain a voter's registration with the
voter's identification number or name. Simply searching for an individual's name in the
database, however, results in a list of registered voters with that identical name. The result
is the same if one physically searches the printed registration rolls. In order to specifically
identify an individual voter, one needs the voter's identification number or address. 

 There was evidence regarding the handling of provisional ballots. Admitted into
evidence are copies of opened and unopened provisional ballot envelopes. According to
Navarro, a ballot board determines the propriety of a provisional ballot; opened provisional
ballot envelopes are counted, and unopened envelopes are not counted. Navarro testified
that there were twenty-five provisional ballots from qualified voters that were not counted. 
Navarro further testified that there were thirty-eight provisional ballots of ineligible voters
that were counted. 

E. Testimony of Elma Garza 

 Contestant Elma Garza, a librarian for a Rio Grande City middle school and an
incumbent in one of the races, examined the combination forms and compared them to the
online database of registered voters. Generally, Garza testified that because of missing
addresses or deficient voter identification numbers, she was not able to ascertain the
eligibility of 208 voters who voted on April 30, 2007 at Bentsen Elementary
("unascertainable voter list 1") and of 97 voters who voted early at the Sullivan City fire
department ("unascertainable voter list 2"). She further testified that based upon her
comparison of the election day combination forms for Reyna Elementary, she found 211
voters that she alleged were illegal ("illegal voter list"). (14)
 

 As Garza began testifying about the first name on the illegal voter list, Contestees
objected. They argued that Garza could not establish the factual issues related to
ascertaining an individual's residency based upon only a review of the online voter
registration rolls. Contestees, therefore, argued that Garza could not provide reliable
testimony regarding a voter's eligibility to vote. According to Contestees, each voter should
have been subpoenaed to court for examination by counsel and a determination by the
court of eligibility. 

 Perhaps in response to Contestees' repeated objections, Garza did not testify
line-by-line as to the problems with each individual voter. Instead, she created two lists of
voters whose eligibility could not be ascertained and one list of voters who allegedly voted
illegally. Garza's three lists were admitted without objection, but with the understanding
that they represented only allegations.

1. Voters whose Eligibility could not be Ascertained

 Garza testified that she examined the early voting combination lists for Bentsen
Elementary and the Sullivan City fire department. As already noted, those lists do not
contain voter addresses. Garza attempted to ascertain the eligibility of each voter by
entering the voter's name or registration number into the database of registered voters. 
In some instances, the voter identification number was deficient. According to Garza, if an
individual's name was searched on the online database and the search produced multiple
results--none of which matched the identification number on the combination form--then
that voter's eligibility was unascertainable. Garza, in "unascertainable voter list 1,"
concluded that there were 208 voters who voted at Bentsen Elementary on April 30, 2007,
whose eligibility could not be ascertained. She also concluded, in "unascertainable voter
list 2," that there were 97 voters who voted at the Sullivan City fire department on the same
day whose eligibility could not be ascertained.

2. Illegal Votes

 Through her testimony, Garza alleges that 218 illegal votes were counted. Garza
alleged that those votes were illegal because the names of 127 individuals who actually
voted in the election did not appear in the online database that she searched. Garza's
comparison of the online database to the combination lists also revealed 72 voters who
voted in the election that were registered in the database, but whose database file shows
that they do not reside in the La Joya School District. Garza also found that the names of
four voters did not match their voter identification number and that five voters voted in the
wrong precinct on election day. 

F. Testimony of Aida Rivas and Evidence of Alleged Conspiracy

 Aida Rivas testified regarding her involvement with the election. She claims that she
was notified a week or two before the election that she had been selected as an election
judge. She did not know how Gloria Amador and Linda Tijerina were appointed to be
election clerks. Rivas testified that they just showed up. Regarding the selection of
Montelongo to be an election clerk, Rivas testified that she found him in the parking lot
while she was taking a bathroom break and asked him to serve as an election clerk
because they were swamped. Rivas did not know that Montelongo could not read, write,
or speak English.

 Admitted into evidence were the mobile phone records of Rivas, John Alaniz, Rita
Garza-Uresti, and Irene Garcia. The records reveal that numerous phone calls were made
between Rivas and Alaniz during the election period. Alaniz is a La Joya School Board
member and the city manager for Palmview; he is also Rivas's boss. Alaniz could not
recall the nature of the phone calls. Rivas, however, vividly recalled that the phone calls
were related to an engineer doing business with the City of Palmview. 

 Rivas, in deposition testimony, denied ever calling Rita Garza-Uresti, a school board
member who supported Contestees, during the election. However, at trial Rivas testified
that she called Uresti to request soup because she was sick to her stomach. Uresti
testified that Rivas might have called her, but she could not remember.

 A final piece of alleged conspiracy evidence is Rivas's phone log for May 4, 2007
at 6:00 p.m. After the polls had closed during an early voting day, Rivas called Alaniz,
Irene Garcia, Jorge Garcia, Kino Flores, and Rita Garza-Uresti. Rivas could not recall why
she called those individuals in that order within a few minutes of each other. Rivas
concluded her testimony by stating that although some mistakes were made, she ran a fair
election. Having presented testimony and records that alleged a conspiracy to rig the
election, Contestants rested. 

G. Evidence of an Internal Investigation 

 Contestees' evidence came largely from the testimony of Alejandro Perez, a La
Joya ISD police officer, and Raul Gonzalez, chief of La Joya ISD police. Perez testified
that he investigated complaints from both political camps during the election. He
interviewed Dora Saenz, who claimed that Rivas assisted her in voting, that she wanted
to vote for Villarreal, and that Rivas cast her vote for Gonzalez instead. Officer Perez also
spoke with Alejandra Rodriguez, who stated to him that Rivas was fair but rude.

 Chief Gonzalez testified that he found no evidence of fraud in the election. During
the course of investigating polling place complaints, he reviewed an affidavit executed by
Dora Saenz, which stated that Rivas had cast Saenz's vote contrary to her intent. Chief
Gonzalez also interviewed Cesria Aranda, whose complaint was that Rivas would not allow
her to enter the polling place with an assistant. Contestees rested after Chief Gonzalez's
testimony. 

H. Conclusion of Trial

 Both parties presented motions for directed verdict before closing arguments. On
October 19, 2007, the trial court orally rendered judgment in favor of Contestants. The
written judgment, signed on October 29, 2007, states that the trial court found that
Contestants proved "by clear and convincing evidence that illegal votes were counted, that
officials failed to count some legal votes and that election judges engaged in fraud and
illegal conduct and made mistakes. . . ." Contestees did not request findings of fact or
conclusions of law and none were filed. Contestees filed a notice of appeal on November
13, 2007. This appeal was accelerated and briefing concluded on January 22, 2008. See
Tex. Elec. Code Ann. § 232.015 (Vernon 2003) (providing that an appellate court may
accelerate an appeal in a contest of a general election).

II. SCOPE OF TRIAL COURT'S INQUIRY To overturn an election, an election contestant must demonstrate by clear and
convincing evidence that "voting irregularities materially affected the election results." Tiller
v. Martinez, 974 S.W.2d 769, 772 (Tex. App.-San Antonio 1998, pet. dism'd w.o.j.). The
focus of the trial court's inquiry, as dictated by the election code, is to attempt to determine
the true outcome of the election, if possible: 

(a) The tribunal hearing an election contest shall attempt to ascertain
whether the outcome of the contested election, as shown by the final
canvass, is not the true outcome because:


 (1) illegal votes were counted; or


 (2) an election officer or other person officially involved in the
administration of the election:


 (A) prevented eligible voters from voting;


 (B) failed to count legal votes; or


 (C) engaged in other fraud or illegal conduct or made a
mistake.


Tex. Elec. Code Ann. § 221.003(a) (Vernon 2003). 

 In this case, the trial court's order tracks the language of the statute. The trial court
found that Contestants "proved by clear and convincing evidence that illegal votes were
counted, that officials failed to count some legal votes and that the election judges
engaged in fraud and illegal conduct and made mistakes all of which materially affected
the outcome of the election and as a result the Court cannot ascertain the true outcome
of the election." Accordingly, the trial court declared the election void and ordered a new
election. 

III. CONTESTEES' FIRST ISSUE

 By their first issue, Contestees' assert that the trial court erred in overturning the
election results. Contestees contend that the evidence is legally insufficient to support the
trial court's judgment. They argue that Elma Garza's testimony regarding her comparison
of the combination lists and online voter registration database is no evidence because (1)
it was testimony admitted over objections and (2) the residency of each challenged voter
was not established by the lists of allegations that Garza compiled. Contestees specifically
argue that:

Contestants presented three main exhibits to establish illegal and/or
improper votes, [unascertainable voter lists 1 and 2, and illegal voter list]. Ms.
Garza, a Contestant in this case, testified she prepared the exhibits. 
Objections were made based on the hearsay nature of the exhibits, lack of
foundation and Ms. Garza's improper expert testimony. Regardless, she
admitted that she could not establish one way or the other whether the voters
listed in [unascertainable voter lists 1 and 2] were eligible to vote in La Joya
ISD or Hidalgo County on the date of election. She admitted she made no
attempt to interview any of the voters and none were brought in to testify. 
She wholly failed to establish in which particular election contest that the
alleged voters voted or how their votes would have affected the outcome of
the election. The list regarding any voter listed on [unascertainable voter lists
1 and 2], therefore, constitute no evidence and the lists are of no value.


With regard to [the illegal voter list], Ms. Garza again admitted she had not
spoken to any voters regarding their residency and none of the voters on the
list were called in by contestants to testify regarding their status and the list
(two separate voters were called in to testify but questions were not made
regarding their volition, intent and action). In fact, the only witness called in
from the list were stipulated to by Contestants, admitting they were qualified
to vote in La Joya ISD, Hidalgo County and were otherwise qualified to vote
on the day of the elections. [The illegal voter list] is essentially of no value to
Contestants and they have not established that the voters were not eligible
to vote, in which election contest they voted, nor how their votes affected the
outcome of the election. 


Brief of Appellant at 21-22, Domingo Villarreal and Elma Garza v. Arturo Gonzalez and
Esperanza Ochoa, No. 13-07-704-CV (Tex. App.-Corpus Christi, Jan. 14, 2008). 

 We find that Contestee's first argument, in which they contend that Garza's
testimony was admitted over objection, is advanced without a single citation to any legal
authority. Because Contestees' argument is merely a bald assertion of objections made
to the trial court without any citations to the record or legal authority; (15) it is inadequately
briefed and, therefore, waived. Tex. R. App. P. 38.1(h) (providing that the brief must
contain a clear and concise argument for the contentions made, with appropriate citations
to authorities and to the record); Trenholm v. Ratcliff, 646 S.W.2d 927, 934 (Tex. 1983). 

 By their second argument, Contestees' invite us to employ a de novo review of the
residency of each individual voter that Contestants alleged were ineligible or illegal and to
reverse the trial court's judgment because Contestants did not present clear and
convincing evidence as to each voter's residency. We decline to do so because
Contestees have failed to present us with any authority, nor have we encountered any, to
suggest that any standard other than abuse of discretion is appropriate in an appeal from
a trial court's judgment in an election contest. Tex. R. App. P. 38.1(h). 

 Contestees' remaining argument, as we understand it, is the legal sufficiency prong
of the abuse of discretion test. (16) We will, therefore, detail (a) the abuse of discretion
standard of review, and (b) the prism through which we will review the evidence in
determining whether the trial court abused its discretion.

A. Standard of Review: Abuse of Discretion

 The trial court's determination in this case is due a certain amount of respect. As
we have previously held, we must review a judgment in an election contest to determine
whether the record shows that the trial court abused its discretion. Guerra v. Garza, 865
S.W.2d 573, 576 (Tex. App.-Corpus Christi 1993, writ dism'd w.o.j.); Reese v. Duncan, 80
S.W.3d 650, 655 (Tex. App.-Dallas 2002, pet. denied). 

 A trial court commits an abuse of discretion if its decision is so arbitrary and
unreasonable that it rises to the level of a clear and prejudicial error of law. Walker v.
Packer, 827 S.W.2d 833, 839 (Tex. 1992). In reviewing a court's factual determinations
for an abuse of discretion, we may not substitute our judgment for that of the trial judge.
Id. We give a great deal of deference to the trial court, as the trier of fact, in its
determination of both the credibility of the witnesses and the weight of their testimony.
Slusher v. Streater, 896 S.W.2d 239, 245 (Tex. App.-Houston [1st Dist.] 1995, no writ);
Green v. Reyes, 836 S.W.2d 239, 212 (Tex. App.-Houston [14th Dist.] 1992, no writ). 
Moreover, the trial court possesses the discretion to resolve any conflicts arising from the
evidence. Alvarez v. Espinoza, 844 S.W.2d 238, 246 (Tex. App.-San Antonio 1992, writ
dism'd w.o.j.). Consequently, we may not overturn the trial court's judgment unless it is
apparent from the record that the trial court could have reached only one result. Walker,
827 S.W.2d at 839-40; Tiller, 974 S.W.2d at 777.

 On review of a judgment rendered after a non-jury trial, if findings of fact or
conclusions of law are neither filed nor requested, the reviewing court will imply all
necessary findings of fact to support the judgment. Cadle Co. v. Ortiz, 227 S.W.3d 831,
834 (Tex. App.-Corpus Christi 2007, pet. filed). When a reporter's record is presented on
appeal, the legal and factual sufficiency of the implied findings may be challenged as if
they were jury findings or a trial court's findings of fact. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 795 (Tex. 2002); Roberson v. Robinson, 768 S.W.2d 280, 281
(Tex. 1989).

B. Legal Sufficiency Review

 A legal sufficiency review of a finding for which the burden of proof at trial was clear
and convincing evidence must necessarily take into consideration the higher evidentiary
burden imposed by the "clear and convincing" standard of proof. In re J.F.C., 96 S.W.3d
256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree
of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established." Id. at 264. "Our legal sufficiency review,
therefore, must take into consideration whether the evidence is such that a factfinder could
reasonably form a firm belief or conviction about the truth of the matter on which the State
bears the burden of proof." Id. at 265-66.

 The supreme court has explained the prism through which we must view the record
in a legal sufficiency review of this type as follows: 

 The distinction between legal and factual sufficiency when the burden of
proof is clear and convincing evidence may be a fine one in some cases, but
there is a distinction in how the evidence is reviewed. In a legal sufficiency
review, a court should look at all the evidence in the light most favorable to
the finding to determine whether a reasonable trier of fact could have formed
a firm belief or conviction that its finding was true. To give appropriate
deference to the factfinder's conclusions and the role of a court conducting
a legal sufficiency review, looking at the evidence in the light most favorable
to the judgment means that a reviewing court must assume that the
factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so. A corollary to this requirement is that a court should
disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible. This does not mean that a court must
disregard all evidence that does not support the finding. Disregarding
undisputed facts that do not support the finding could skew the analysis of
whether there is clear and convincing evidence.


Id. at 266 (emphasis in original). With these principles in mind, we now turn to the law and
the evidence.

C. Legal and Illegal Votes

 Contestees argue that Elma Garza's testimony is no evidence that illegal or
ineligible votes were cast or that mistakes were made so as to render the election's
outcome undeterminable. The trial court took judicial notice of the election code and of
voter eligibility requirements. We outline the law and its application to the instant facts
below.

1. Applicable Law

 To be eligible to vote in an election, a person "must be a qualified voter on the day
the person offers to vote; be a resident of the territory covered by the election; and satisfy
all other requirements for voting prescribed by law." Slusher, 896 S.W.2d at 247 (citing
Tex. Elec. Code Ann. § 11.001 (Vernon 1986)). "A qualified voter is one who is 18 years
of age or older; is a United States citizen; has not been determined mentally incompetent;
has not been finally convicted of a felony, except under certain circumstances; is a resident
of this state; and is a registered voter." Id. (citing Tex. Elec. Code Ann. § 11.002 (Vernon
1986)).

 An "illegal vote" is one that "is not legally countable." Tex. Elec. Code Ann. §
221.003(b) (Vernon 2003). For example, a vote cast in a precinct by a person who does
not reside in the county of the election is an illegal vote that cannot be counted. Alvarez,
844 S.W.2d at 247 ("As a matter of law, the other six voters were nonresidents, who should
not have voted in this precinct three election."). Additionally, a vote cast in a precinct by
a person who resides in the county but does not reside in that precinct is an illegal,
uncountable vote. Tex. Elec. Code Ann. § 11.003 (Vernon 2003) ("Except as otherwise
provided by this code, a person may vote only in the election precinct in which the person
resides."); Harrison v. Jay, 271 S.W.2d 388, 389 (Tex. 1954) (citing statutory predecessor
to section 11.003 and holding that "[w]hen a voter leaves his own polling place to vote at
a polling place not used by the voting residents of his own residence district, his ballot has
not been allowed to count."); Medrano v. Gleisner, 769 S.W.2d 687, 689 (Tex.
App.-Corpus Christi 1989, no writ) (sufficient evidence of illegal votes existed where voters
voted in a precinct in which they did not live); Zuniga v. Almarez, 514 S.W.2d 331, 334
(Tex. Civ. App.-San Antonio 1974, no writ) (trial court properly refused to count vote cast
in wrong precinct); Borroughs v. Williamson, 312 S.W.2d 717, 721 (Tex. Civ. App.-El Paso
1958, writ dism'd) (holding that even though voters held a good faith belief that they voted
in correct precinct, their votes were illegally counted because they, in fact, voted in the
wrong precinct).

2. Application of Law to Facts

 As stated above, Garza identified four categories of illegal votes that were cast
during the course of the election. First, she testified that 127 voters' names and
identification numbers listed on the combination forms do not appear on the online voter
registration database. Second, she stated that 72 voters listed on the combination forms
are registered voters but, according to the online database, do not reside in the La Joya
School District. Third, she testified that with respect to four voters, the names and
registration numbers provided on the forms did not match. Finally, she alleged that five
voters voted in the wrong precinct.

 The second (72 voters) and last (5 voters) categories can be readily addressed. As
stated above, to be eligible to vote in an election, a person must be a "resident of the
territory covered by the election." Slusher, 896 S.W.2d at 247 (citing Tex. Elec. Code Ann.
§ 11.001); Alvarez, 844 S.W.2d at 247. The 72 voters who cast their vote in the La Joya
School District election but who did not reside in the La Joya School District clearly were
not eligible to vote, and their votes were legally uncountable. Additionally, it is beyond
dispute that a voter must vote in the proper precinct on election day; if not, the vote is
legally uncountable. Tex. Elec. Code Ann. § 11.003 ("Except as otherwise provided by this
code, a person may vote only in the election precinct in which the person resides.");
Harrison, 271 S.W.2d at 389. Thus, Garza's testimony that five voters voted in the wrong
precinct on election day establishes that those votes were not legally countable.

 Garza's testimony in the trial court was largely undisputed. In fact, Contestees
neither presented any evidence to the trial court that Garza's calculations were incorrect,
nor did they cross-examine her as to each name on her list of allegations. Contestees
rested their entire evidentiary examination of Garza's list on their argument that the list was
merely a set of allegations and did not represent a proven violation of the election code.
Accordingly, the trial court was entitled to rely on this testimony and the corresponding
exhibits to form a firm belief or conviction in the truth of the allegation that at least 77 votes
cast on election day were illegally counted. 

3. Evidence Outside the Appellate Record

 In their reply brief to this Court, Contestees have submitted charts which they
implicitly contend demonstrate that some of these voters were in fact residents of the
district and voted in the proper precinct. However, Contestees did not present such
evidence to the trial court. In other words, Contestees presented no evidence disputing
Garza's numbers. Under these circumstances, we cannot credit Contestees' untimely
calculations and their implicit request that we perform our own cross-examination of
Garza's calculations. (17)
 It was reasonable for the trial court to credit Garza's testimony
given the complete absence of any dispute regarding the same before the trial court. 
Accordingly, legally sufficient evidence supports the trial court's implied finding that 77
votes were illegally cast. 

 With respect to the remaining categories of illegal votes, we find that they are more
properly categorized as mistakes made by the election clerks, which clouded the true
outcome of the election. We now turn to a discussion of those issues. 

D. Votes Cast After Recording Mistakes Were Made

 The election code does not require a trial court to rely solely on "illegal votes" in
attempting to ascertain the true outcome of an election. As is evident from section
221.003, the outcome of an election can be muddled not just by the counting of illegal
votes or the failure to count legal votes, but also by mistakes made by election officers. 
Tex. Elec. Code Ann. § 221.003(b)(2)(C) (Vernon 2003); see Alvarez, 844 S.W.2d at 242. 
A contestant may allege and prove that "irregularities rendered impossible a determination
of the majority of the voters' true will." Guerra, 865 S.W.2d at 576.

 The language used in the election code regarding mistakes is obviously broad and
could be read to include all sorts of election code violations. Courts must be mindful,
however, that noncompliance with the strict requirements of the election code in many
instances will not undermine the outcome of an election. For example, in Honts v.
Johnson, the Austin Court of Appeals determined that election officials violated section
43.001 of the election code by joining nineteen election precinct polling places. Honts v.
Shaw, 975 S.W.2d 816, 821 (Tex. App.-Austin 1998, no pet.). The court of appeals,
however, held that the violation did not justify an order setting aside the election. Id. 
Specifically, it held that the provisions violated were merely directory and did not affect the
legality of the votes cast at the illegally combined precincts because there was no evidence
that the resulting election was unfair. Id. at 821-824. In doing so, the court noted that

 [t]he purpose of the [Election] Code is to prohibit error, fraud, mistake, and
corruption, and yet it may not be used as an instrument of
disenfranchisement for irregularities of procedure. Since the will of the legal
voters as expressed at the polls is the matter of paramount concern, and, in
the absence of any showing of fraud, or reasonable indication that such will
has not been fairly expressed and the evidence thereof properly preserved,
the courts have been liberal in construing and enforcing as directory only the
provisions of the election laws which are not upon their face clearly
mandatory.

Id. at 821 (quoting Prado v. Johnson, 625 S.W.2d 368, 369-70 (Tex. Civ. App.-San
Antonio 1981, writ dism'd w.o.j.)).

 We quote the above language not merely to demonstrate that certain violations of
election code provisions may not undermine the outcome of an election, but also to
demonstrate that some, in fact, may. The purpose of the election code is to ensure that
the true will of the voters is "fairly expressed" and that the evidence of that expression is
"properly preserved." Prado, 625 S.W.3d at 369-70. 

1. Applicable Law: Responsibilities of Election Officials

 There are many provisions contained in the election code that demonstrate the
code's purpose to preserve evidence of the qualified voters' true will. Although no court
has expressly addressed these issues in connection with an election contest, we believe
that violations of certain recording provisions by election clerks can certainly undermine the
purpose of the election code and obscure the true will of the qualified voters. By necessity,
election officials are required to obtain and record certain information from individuals who
present themselves at a polling place to vote. Election officials, under the code, are
provided with certain tools with which they can verify information provided by a voter. We
will discuss each of these in turn, as they are relevant to our inquiry.

 First, before early voting begins, the registrar for the county prepares a list for each
precinct of the registered voters in the precinct who will be eligible to vote in the election
(the "registration list or registration rolls"). Tex. Elec. Code Ann. § § 18.001(a), 18.002,
18.003, 18.004 (Vernon 2003). The registration list contains the voters' names, residence
addresses, dates of birth, and registration numbers, and is organized alphabetically by
voter name. Id. § 18.005 (Vernon Supp. 2007). These lists are provided to the election
officials conducting the election and are used during early voting and on election day to
help identify qualified voters. Id. § 18.006 (Vernon 2003).

 Second, an election clerk must also maintain a signature roster at the polling place,
which a voter must sign upon being accepted for voting and before actually casting a vote. 
Id. § 63.002 (Vernon 2003). Third, the election clerk must maintain a poll list. Id. § 63.003
(Vernon 2003). After a voter is accepted and signs the signature roster, the election clerk
must also enter the voter's name on a poll list in the same order in which the voter appears
on the signature roster. Id.

 Finally, the election code further specifically requires that election officers maintain
a "registration omissions list" as follows:

(a) A registration omissions list shall be maintained by an election officer
at the polling place.


(b) With respect to each voter who is accepted for voting but whose
name is not on the list of registered voters for the precinct in which the
voter is accepted, the election officer shall record:


 (1) the voter's name, residence address, and voter registration
number, if known; and


 (2) a notation of the section of this code under which the voter is
accepted that provides for accepting voters who are not on the
list.


Id. § 63.005 (Vernon 2003). The secretary of state, however, can prescribe forms that
combine the poll list and the signature roster or any other form required to facilitate this
process of identifying voters. Id. § 63.004 (Vernon 2003). 

 When a combination form is used, as was done in the election under review, each
line of the form contains multiple spaces for the information that must be provided and/or
recorded when a voter is accepted for voting. For example, the combination form used in
this election includes spaces for (1) the precinct number of the voter; (2) the voter's
registration certificate number; (3) the poll list where the election clerk inserts the name of
the voter; (4) the voter's address, to be filled in by the election clerk in case of an omission
issue; and (5) a space for the voter's signature to satisfy the signature roster requirement. 
Additionally, several columns are provided that are identified by the section of the election
code under which a particular voter is allowed to vote--in other words, an omissions list. 
For example, the columns in the combination form used in this election included (1) voters
not on the registration list but allowed to vote under section 63.006; (2) voters with an
incorrect certificate allowed to vote under section 63.007; (3) voters without a voter
registration certificate who are not on the registration list and who are accepted for voting
under section 63.009; and (4) voters who cast a provisional ballot under section 63.011. 

 Under ideal circumstances, an individual voting in person will present a certificate
showing that he is registered to vote in the territory covered by the election, and his name
will appear on that particular precinct's list of registered voters. Id. § 63.001(a)-(d) (Vernon
2003). An individual who presents himself at the polling place with a registration certificate
and whose name appears on the list of registered voters for the precinct of the polling
place will be accepted for voting. Id. § 63.001(d). The voter signs the signature roster, the
election clerk inserts the voter's name on the poll list, and the election clerk must note on
the registration list that the voter was accepted. Id. § 63.001(e). 

2. Application of Law to Facts

 As stated above, Garza testified that 127 voters' names and identification numbers
listed on the combination forms do not appear in the online voter registration database, and
that with respect to four voters, the names and registration numbers provided on the forms
did not match. Additionally, during early voting, 208 voters presented themselves and
voted at Bentsen Elementary, but these voters' eligibility to vote could not be ascertained
because there were no addresses on the combination forms. Garza testified that she
could not ascertain the eligibility of an additional 97 voters who voted during early voting
at the Sullivan City fire department. This does not mean that these voters necessarily
voted illegally; however, the failure to include other identifying information--mainly
addresses--in the combination form makes it impossible to tell whether these voters legally
cast their votes. The sum of 127, 208, 97, and 4 is 436. We next discuss the statutory
safeguards that are in place that should have made ascertaining the eligibility of these 436
voters readily apparent from the face of the record.

E. Statutory Safeguards

 The election code provides for the many problems that can arise when a voter
presents for voting under less than the ideal circumstances noted above. First, a voter
may arrive with a voter registration certificate but the election clerk cannot locate that
person on the registration list. Id. § 63.006 (Vernon 2003). Such a voter may be accepted
for voting, but certain procedures must be followed to document that person's acceptance.
Id. The voter must sign the signature roster and that person's name must be entered on
the poll list by the election clerk, as with any voter. The election clerk must also write down
the residence address and the voter registration number, if known, on the omissions list. 
Id. § 63.005(b) (Vernon 2003). Finally, the election clerk must also note on the poll list that
the person was allowed to vote under section 63.005, and the combination forms provide
a box that may be checked to note that the voter was accepted under these conditions. 
Id. 

 Second, a voter may arrive with an incorrect certificate, i.e. showing that the voter
is registered in a different precinct than that of the polling place, and may also not appear
on the precinct's list of registered voters. Id. § 63.007 (Vernon 2003). These voters may
be accepted for voting but must execute an affidavit stating that the voter is a resident of
the precinct, is entitled to vote, and did not deliberately falsify the information that the voter
provided to the registrar. Id. § 63.007(a). However, the election clerk must note on the
combination form that the voter was accepted under this section and enter on the
omissions list the precinct of the voter's registration as indicated by the voter's registration
certificate, as well as include the person's address within the precinct. Id. § §
63.005;63.007(b).

 Finally, a voter may arrive at the precinct without a registration certificate and whose
name does not appear on the list of registered voters. Id. § 63.009(a). When this occurs,
the election clerk is authorized to contact the registrar to determine if the voter is
registered. Id. § 63.009(b). If the registrar confirms that the person is registered, the voter
may be accepted for voting once he presents proper identification. Id. However, the
election clerk is required to note on the combination form that the voter was accepted
under section 63.009(b) and must also fill out the omissions list information. Id. If,
however, the election clerk cannot determine from the registrar that the voter is actually
registered to vote, the voter may be accepted for provisional voting, which means that the
voter casts a special, paper ballot that is kept separate from the machines used for regular
voting. Id. § § 63.009(a); 63.011 (Vernon Supp. 2007). The election clerk must note on
the combination form that the voter cast a provisional ballot.

F. Election Officials' Failure to Follow Statutory Safeguards 

 Garza testified that with respect to 127 voters who cast their votes on election day,
the names or registration certificate numbers could not be located on the list of registered
voters, either because the name did not appear on the list at all or because there were
multiple, identical names on the list that may or may not be the voter. Thus, although
these voters could have been properly allowed to vote, some may have been required to
vote provisionally. Without other identifying information, it is impossible to tell if these
votes were legally cast. Additionally, Garza testified that four voters on election day voted,
but provided an incorrect voter registration number. As for these voters, an address was
not provided. Without more information, it is impossible to tell if these voters were qualified
and properly accepted for voting, or whether they have been required to cast a provisional
ballot.

 With respect to voting during early voting, the same problems arose. Garza testified
that for the same reasons--the lack of an address on the combination forms and the
inability to match a particular voter with a particular listing on the online database--she
could not determine the eligibility of 208 voters from the Bentsen Elementary polling place
and 97 voters at the Sullivan City fire department polling place. These voters either were
legally accepted or should have been provided a provisional ballot--without the required
information on the combination forms, it is impossible to tell. 

 Moreover, Alejandra Rodriguez testified that on April 30, 2007, Rivas did not allow
the election clerks to record voters' addresses on the combination forms, insisting that the
voters be allowed to proceed to the machines because they were "good voters." Rivas also
allowed voters who were not on the registration list and who presented without a voter
identification card to vote, without first verifying the voter's eligibility with the county
elections administration office. Those voters' names were handwritten onto the voter
registration rolls, again, without verification from the elections administration office. 
Rodriguez's testimony of election officials' mistakes corroborates the combination lists
used in creating Garza's list of illegal and unascertainable voters.

 In their reply brief to this Court, Contestees have submitted charts which they
implicitly contend demonstrate that Contestees were able to ascertain the eligibility of some
of these voters. However, Contestees did not present such evidence to the trial court. In
other words, Contestees presented no evidence disputing Garza's numbers. As stated
above, we cannot credit Contestees' untimely calculations and their implicit request that
we perform our own cross-examination of Garza's calculations. 

 It was reasonable for the trial court to credit Garza's testimony given the complete
absence of any dispute regarding the same before the trial court. Accordingly, legally
sufficient evidence supports the trial court's implied finding that with respect to 436 voters,
mistakes by election clerks in failing to record information required by the election code
made it impossible to determine whether those votes were legally cast and countable. 

G. Impossible to Determine True Outcome 

 Contestees argue that Contestants failed to meet their burden to present clear and
convincing evidence because Contestants failed to prove for whom all the challenged
voters cast their votes. With regard to illegal votes, in some instances, a trial court may be
able to determine (1) that illegal votes were cast, (2) the number of illegal votes cast, and
(3) the candidate for whom those votes were cast. For example, a trial court may require
a voter who casts an illegal vote to disclose the name of the candidate for whom that voter
voted. Tex. Elec. Code Ann. §221.009(a) (Vernon 2003). If all the voters who allegedly
cast an illegal vote can be readily identified and brought in to testify before the trial court,
such an inquiry can be easily made. In such a case, the trial court is directed to "subtract
the vote from the official total for the candidate or side of the measure, as applicable." Id.
§ 221.011(a) (Vernon 2003). 

 For example, if Candidate A defeated Candidate B in an election by ten votes, and
the trial court determines that eleven votes were illegally cast in favor of Candidate A, the
trial court is instructed to subtract the eleven votes from Candidate A's election total. The
code provides that if, after the subtraction, the trial court can ascertain the true outcome
of the election, the trial court must declare the true outcome. Id. § 221.012(a) (Vernon
2003). Thus, in our hypothetical, Candidate B could be declared the true winner of the
election. 

 In reality, election contests are not so cut and dry. The election code, however,
recognizes that it may be impracticable or even impossible to determine for whom an illegal
vote was cast. The election code does not require such an inquiry. Rather, the code
provides that "if the tribunal finds that illegal votes were cast but cannot ascertain how the
voters voted, the tribunal shall consider those votes in making its judgment." Id. §
221.011(b) (Vernon 2003). Although section 221.011 does not dictate exactly how those
illegal votes should be considered, section 221.009 provides the answer: "[i]f the number
of illegal votes is equal to or greater than the number of votes necessary to change the
outcome of an election, the tribunal may declare the election void without attempting to
determine how individual voters voted." Id. § 221.009(b) (Vernon 2003). In other words,
if a trial court determines that illegal votes were cast and that the number of illegal votes
equals or is greater than the margin of victory, the trial court can then declare the election
void without ever inquiring as to the candidate for whom those illegal votes were cast. See,
e.g., Slusher, 896 S.W.2d at 240; Alvarez, 844 S.W.2d at 242 (holding that the election
code permits a trial court to determine whether the number of illegal votes cast exceeded
contestee's margin of victory without determining for which candidate illegal votes were
cast); Kelley v. Scott, 733 S.W.2d 312, 314 (Tex. App.-El Paso 1987, writ dism'd)
(judgment declared void because one illegal vote was cast, which equaled the number of
votes to change the outcome of the election, regardless of the candidate for whom the
illegal voter casts her vote).

H. Holding

 We have found legally sufficient evidence to support a finding that 77 illegal votes
were cast and that 436 votes were cast that may have been illegal, but which cannot be
determined based on mistakes made by the election clerks. In this case, Contestants
demonstrated that the margins of victory for Contestees were as follows: (1) Contestee
Arturo Gonzalez, Jr. defeated Contestant Domingo Villareal by 322 votes; and (2)
Contestee Esperanza Ochoa defeated Contestant Elma Garza by 403 votes. 

 Although the number of illegal votes here does not account for the margin of victory
of either contested race, the number of voters who may not have been eligible certainly
does. The election code does not provide any guidance as to how a trial court should
weigh a "mistake" by an election clerk. But given the importance of recording the true will
of the voters, we believe that if a sufficient number of voters are rendered potentially
ineligible by mistakes made during the recording process to account for the entire margin
of victory, the trial court is within its discretion to declare the election void because it is
impossible to determine the true outcome of the election. 

 Here, we believe it was not necessary for the trial court to determine that the
challenged voters voted for Contestees to find that the outcome of the election was
materially affected. Alvarez, 844 S.W.2d at 242; Kelley, 733 S.W.2d at 314. We also
disagree that the fact that there were two contested races in this election changes the
above-stated rules. The largest margin of victory in this case was 403 votes, and the
irregularities in the election process accounted for more votes than the largest margin of
victory. The trial court had before it legally sufficient evidence that undermined the
outcome of the election to such an extent that the trial court properly declared the election
void. 

IV. CONCLUSION

 Contestees' first issue is overruled. Because we have found that the trial court was
presented with clear and convincing evidence that illegal votes were counted and that
election judges made mistakes which materially affected and obscured the true outcome
of the election, we need not address Contestees' second and third issues, for the
resolution of those issues would not further affect the outcome of this appeal. Tex. R. App.
P. 47.1. The judgment of the trial court is affirmed. (18) The trial court is instructed to
immediately prescribe a new election date in accordance with the election code. See Tex.
Elec. Code Ann. § 231.007 (Vernon 2003).


 _______________________

 ROGELIO VALDEZ,

 Chief Justice



Opinion delivered and filed on

this the 7th day of February, 2008.

1. The Contestants' petition is our only source for the total votes garnered by Gonzalez and Villarreal. 
Mathematically, it produces a 321 vote difference. Throughout the record, however, the victory margin
between Gonzalez and Villarreal is testified to as 322.
2. The allegedly illegal and biased election judge presided over two polling sites. The tally for place
four from those two polling sites is Gonzalez, 876, Villarreal, 540, producing a 336 victory margin at those
polling places. The tally for place five is Ochoa, 885, Garza, 545, for a 340 margin of victory at those polling
places.
3. Two alternate election judges were also appointed, but they later refused to serve. The record,
however, is not clear as to when the two alternate election judges refused to serve.
4. The record is not clear as to how Sofia Villarreal was appointed as the school district's election
administrator. The school board agendas and minutes from December 2006 through May 2007 do not show
any formal board action taken regarding Sofia Villarreal's appointment. Rita Garza-Uresti, a school board
member, testified that Sofia Villarreal was formally appointed by the school board.
5. John Alaniz is the Palmview City Manager and directly supervises Rivas, who is his secretary.
6. Early voting began on April 30, 2007. As previously noted, Sofia Villarreal's informal note to
Benavides is dated April 11, 2007.
7. A combination form is a sign-in sheet and affidavit used at polling places. It contains columns for
a voter's precinct number, certificate number ("voter unique identification number," "VUID" or "registration
number"), name, address, and signature. 

8. Only a handful of voters listed on the suspect combination lists voted provisionally. The vast
majority, at least as evidenced by the combination lists, voted without any restrictions.
9. Generally, a voter who is physically disabled or unable to read is eligible to receive assistance in
marking the ballot. Tex. Elec. Code Ann. § 64.031 (Vernon 2003).
10. Gonzalez and Ochoa's platform was pro-busing. They campaigned on little yellow school buses
and were colloquially known as "los bosesitos."
11. The only reference in the record to an "Irene," is Irene Garcia, the originally appointed and statutorily
disqualified election judge. 
12. The voter registration rolls constitute forty-seven exhibits and many are hundreds of pages long. 
13. As previously noted, April 30, 2007 early voting combination forms for Bentsen Elementary do not
contain voter addresses.
14. Contestees strenuously objected to Garza's testimony on three grounds. First, Contestees claimed
that Contestants shielded the lists from discovery by asserting the attorney work product privilege during
depositions, but then offered them as evidence at trial. Contestees argued that the lists were inadmissible
at trial because such an admission would be an abuse of the discovery process. Second, Contestees argued
that Garza was not qualified to determine a voter's eligibility or legality to vote. They argued that the proffered
lists should be excluded. The trial court took judicial notice of the election code and voting requirements. The
third objection is outlined in the body of this opinion. As discussed in section III below, Contestees' evidentiary
objections have been abandoned on appeal. 


15. We also note that Contestees have failed to cite for us, and the reporter's record does not readily
reveal, the trial court's rulings on Contestees' numerous objections to Elma Garza's testimony. Tex. R. App.
P. 33.1(a)(c)(A) (providing the procedure for preservation of error); 38.1(h).
16. In determining whether there has been an abuse of discretion because the evidence is legally or
factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial
court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its
application of discretion? See generally, Lindsey v. Lindsey, 965 S.W.2d 589, 592 (Tex. App.-El Paso 1998,
no pet.). 
17. Texas Rule of Appellate Procedure 38.1(f) requires appellate briefs to contain a statement of facts
that is supported by record references. See Tex. R. App. P. 38.1(f); Burke v. Ins. Auto Auctions, 169 S.W.3d
771, 775 (Tex. App.-Dallas 2005, pet. denied). An appellate court cannot consider documents cited in a brief
and attached as appendices if they are not formally included in the record on appeal. See Burke, 169 S.W.3d
at 775; Green v. Kaposta, 152 S.W.3d 839, 841 (Tex. App.-Dallas 2005, no pet.).

18. We address herein pending motions in this appeal. We deny appellees' motion to dismiss the
appeal, and dismiss as moot appellees' motion requesting that we order this appeal to take precedence and
shorten the briefing deadlines, given that the Court has already granted the substance of the requested relief
in conjunction with an earlier-filed motion. We dismiss as moot appellants' emergency motion to stay. We
grant in part and deny in part appellees' motion requesting en banc submission, to shorten or deny rehearing,
and to immediately issue mandate. Specifically, we deny appellees' motion for en banc submission (Vela, J.,
not participating), we grant appellees' motion to deny rehearing, and we are issuing the mandate with the
judgment in this cause. See Tex. R. App. P. 18.6, 49.4.